MOULTON v. FIELD et al.

(Circuit Court of Appeals, Seventh Circuit. April 19, 1910.)

No. 1,628.

1. CORPORATIONS (§ 317*)—OFFICERS—LIABILITY FOR MISAPPROPRIATION OF FUNDS.

Defendant was president of a mutual life insurance company, the general manager of which had a contract giving him sole control and management for 25 years on a percentage basis, subject to the charter and by-laws. He also controlled the election of directors through proxies. When the contract had still four years to run, he became incapacitated and sold the contract to another, receiving $125,000 therefor. Defendant, being a party to the scheme by which the directors approved the transfer, increased all of their salaries, and on the same day bought from the new manager with funds of the company a list of the members of another insolvent company with which he had been connected paying him $200,000 therefor, with which he paid the $125,000 to the retiring manager, retaining the remainder. Such list was of no direct financial benefit to the company. *Held*, that the entire transaction was a fraud upon the company and a betrayal of trust on the part of defendant as an officer which rendered him liable to the company for the $200,000, so fraudulently taken from its funds.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1401–1415; Dec. Dig. § 317.*]

2. CORPORATIONS (§ 317*)—OFFICERS—SALE OF OFFICIAL POSITIONS.

A contract between a mutual insurance company and its general manager, by which he was to receive for a term of years a percentage on the business done, was one for personal services which he could not transfer to another, and on his becoming incapacitated the value of the unexpired term, if any, belonged to the company, and the action of the officers and directors in permitting him to sell and transfer it to another for a large sum received for his own use was a violation of their duty of good faith toward the company and a betrayal of their trust.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1401–1415; Dec. Dig. § 317.*]

Appeal from the Circuit Court of the United States for the Eastern Division of the Northern District of Illinois.

Suit in equity by Allen W. Field and others, as policy holders in the Western Indemnity Company, against George M. Moulton and others. Decree for complainants (166 Fed. 607), and defendant Moulton appeals. Affirmed.

Richard S. Folsom and Eugene F. Ware, for appellant.

S. S. Gregory and Jacob Newman, for appellees.

Before GROSSCUP, BAKER, and SEAMAN, Circuit Judges.

BAKER, Circuit Judge. Appellees, policy holders in a mutual life insurance company, brought suit against the company and Gray, Rosenfeld, and appellant Moulton as officers thereof to recover for the use of the company a sum of $200,000 alleged to have been wrongfully taken by said officers from the company's treasury. The master's report and the decree on exceptions thereto sustained appellees' right of recovery. On this appeal the sole question is the sufficiency

of competent evidence to establish facts which in law can support the decree as against Moulton.

Not resting on the circuit court's approval of the master's report, we elicit from the voluminous record the following facts pertinent to the question of Moulton's liability.

In 1884 Gray organized the company and secured from it on a percentage basis a contract whereby for 25 years he should have the sole control and management, subject to the charter and by-laws, and the custody of the books, records, and papers, subject to inspection by the board of directors at any regular or special meeting. The contract further provided that no copy of the membership should be made by Gray except as needed in the proper work of the company, and that no copy or list should be made by or for other parties for any purpose whatever without the unanimous vote of the directors. Gray, until Rosenfeld succeeded him in 1905, obtained and held enough proxies to control the election of directors. In 1905 Gray was afflicted with a fatal malady, and his physician instructed him to quit work. His contract had then about four years to run, and his compensation amounted to $12,000 a year. Gray offered to sell his contract to Rosenfeld for $125,000. Rosenfeld was willing to pay that amount if he could be put into Gray's shoes as general manager. (Rosenfeld was insolvent and had had comparatively little experience in insurance.) At Gray's suggestion Rosenfeld saw Moulton, who was then, and for many years had been, president of the company at a salary of $1,500 a year. Rosenfeld, after telling of his negotiations with Gray, and indicating that if he were put in Gray's place he would like to have Moulton's active co-operation in the business and would not be opposed to a salary of $5,000 or $6,000 a year for Moulton, asked Moulton if he favored the plan; and Moulton replied, "A man would be foolish to resent opportunity when it knocks at his door." Rosenfeld also represented to Moulton that he controlled a mutual assessment life insurance business in Pennsylvania which on becoming general manager he would turn over to the company for $200,000. Moulton's comment on this was, "I see now that your idea is that the money you are to pay for Gray's contract you really get back directly from the company." Upon thus learning the extent of Rosenfeld's purposes, Moulton demanded that, if the plan was carried through, his salary should be $10,000 a year and, in addition 1 per cent. of all receipts in excess of $1,000,000 a year. To this Rosenfeld acceded. They also agreed that the annual compensation of the other directors should be raised from $600 to $1,000, and that one director who they thought might prove obstructive should become a member of a contemplated executive committee at a salary of $2,500 a year. In the forenoon of February 17th the directors met, approved the assignment of Gray's contract to Rosenfeld, and by resolution installed Rosenfeld as general manager with all the privileges, benefits, and powers that had theretofore been held by Gray. And Rosenfeld that forenoon paid to Gray $125,000 which Rosenfeld (in some undisclosed manner) had temporarily obtained from a bank. At the same meeting the directors created the intended

executive committee, consisting of Rosenfeld, Moulton, and the director above indicated, with authority to fix the salaries of officers and directors (which were fixed as designed) and with full power "to enter into any contract for the transfer of the members of other companies to this company which in their judgment shall be for the best interests of this company." In the afternoon this committee purchased from one Morgan, who was acting for Rosenfeld in the sale, a list of the policy holders of the Pennsylvania company with their addresses and policy records; and $200,000 was taken from the treasury and turned over to Rosenfeld, who at once returned $125,000 to the bank and put $75,000 in his pocket.

Our conclusions are these:

Gray through his proxy system had autocratic power. Mutual life insurance companies differ radically from ordinary industrial enterprises. Every customer by the act of purchasing what the company has to sell becomes an owner of the business. Because policy holders are necessarily numerous, widely scattered, unaquainted with one another, each owning too small an interest in the business to justify the expense of long travel to the owners' annual meeting, the proxy system seems inevitable. Gray took advantage of this not merely to have the proxies made to himself, but to prevent (by his contract) any one from disturbing his proxy control. If such a self-perpetuating autocracy is not unlawful in its very nature (and if not, it might be well that the taking of proxies in mutual life insurance companies by officers, directors or employés should be prohibited by statute), at least the centering of the electorate and the benefits of the election in one person or group of persons raises the highest obligation of good faith and creates the burden of establishing very clearly the fairness and honesty of any challenged benefit.

With this proxy control in Gray's hands, the directors came to regard Gray, and not the owners, as the master of the business. When Gray became incapacitated, his employment should have been ended on that account; and in all probabilities would have been, if the directors had considered themselves servants of the policy holders instead of dependents of Gray. If the succession was worth $125,000 in the market, the sale (if it were lawful) should have been made by the directors for the benefit of the owners of the business, not of Gray. For Gray had nothing legally saleable. His contract, being for personal service, was not assignable; and the resolution of the directors really created a new contract with Rosenfeld. So the arrangement, to which Moulton was knowingly a party, by which the office of general manager and the proxy control were sold to Rosenfeld and the consideration turned over to Gray instead of into the treasury, was a betrayal of trust.

The dealings between Morgan (Rosenfeld) and the executive committee, constituted as aforesaid, were on their face fraudulent. It was Rosenfeld treating with Rosenfeld. To speak of the transaction as the purchase of an insurance business is a euphemism. There was no pretense of a purchase of the Pennsylvania association's interests in its policies, or a contract whereby its members be-

came members of this company, in which event the consideration would belong to such members; there was merely a disclosure by Rosenfeld, who was then general manager of this company, of the names and whereabouts of policy holders in a moribund concern which shortly went into the hands of a receiver—persons who by solicitations and persuasions might or might not be induced to come into contract relations with this company. The solicitations and persuasions were what brought any new business that came from that source; and, if Rosenfeld as general manager did not owe the disclosure, his work as solicitor and persuader was due by reason of his existing official position. So Moulton's part in turning over the $200,000 to Rosenfeld was another betrayal of trust. And it is easy to see that Moulton had this betrayal in view on the occasion when he insisted to Rosenfeld that his pay should be increased to $10,000 a year and a percentage of the company's income.

The suggestion that the record fails to prove that Moulton's services, after this Rosenfeld transaction were not worth $10,000 a year is beside the mark. Subsequent fidelity, fully paid for by his salary, cannot offset his betrayals.

Finally, the contention is raised that the $200,000 decree against Moulton should be reduced or extinguished by the profits that have been and hereafter may be made on the business secured from among the former members of the Pennsylvania association. True, equity allows only compensatory, not punitive, damages. But Moulton on February 17, 1905, jointly with others wrongfully abstracted $200,-000 from the treasury. Liability accrued at that moment. What the paper on which the lists, etc., were written and the information therein contained were worth, the record fails to prove. New business written after February 17th was duly paid for by salaries, commissions, and expenses currently taken from the treasury. So there is nothing to deduct.

The decree against Moulton is affirmed.