## DETROIT EDISON CO. v. SECURITIES & EXCHANGE COMMISSION.

### No. 8735.

Circuit Court of Appeals, Sixth Circuit.

May 12, 1941.

732

Paul W. McQuillen, of New York City, and Oscar C. Hull, of Detroit, Mich. (Sullivan & Cromwell, of New York City, and Oxtoby, Robison & Hull, of Detroit, Mich., on the brief), for petitioner.

J. Leonard Townsend, of Washington, D. C. (Chester T. Lane, Christopher M. Jenks, Lawrence S. Lesser, J. Leonard Townsend, and Stanley L. Kaufman, all of Washington, D. C., on the brief), for respondent.

Before HICKS, SIMONS and HAMILTON, Circuit Judges.

HAMILTON, Circuit Judge.

This is a petition of the Detroit Edison Company, a New York corporation, with its principal office and place of business in the city of Detroit, Michigan, to review an order of the Securities and Exchange Commission, pursuant to Section 24(a) of the Public Utility Holding Company Act of 1935, 49 Stat. 834, 15 U.S.C.A. § 79x.

The order complained of denied the application of the petitioner to the Commission for an order pursuant to Section 2(a) (8) of the Act, 49 Stat. 804, 15 U.S.C.A. § 79b(a) (8), declaring it not to be a subsidiary of the North American Company.

The provisions of the Statute involved are set forth in the margin.[1]

---

[1] " 'Subsidiary company' of a specified holding company means—

"(A) any company 10 per centum or more of the outstanding voting securities of which are directly or indirectly owned, controlled, or held with power to vote, by such holding company (or by a company that is a subsidiary company of such holding company by virtue of this clause or clause (B)), unless the Commission, as hereinafter provided, by order declares such company not to be a subsidiary company of such holding company; and

"(B) any person the management or policies of which the Commission, after notice and opportunity for hearing, determines to be subject to a controlling influence, directly or indirectly, by such holding company (either alone or pursuant to an arrangement or understanding with one or more other persons) so as to make it necessary or appropriate in the public interest or for the protection of investors or consumers that such person be subject to the obligations, duties, and liabilities imposed in this title [chapter] upon subsidiary companies of holding companies.

The Commission, upon application, shall by order declare that a company is not a subsidiary company of a specified holding company under clause (A) if the Commission finds that (i) the applicant is not controlled, directly or indirectly, by such holding company (either alone or pursuant to an arrangement or understanding with one or more other persons) either through one or more intermediary persons or by any means or de-

The petition for exemption was filed March 3, 1937, and the applicant requested the Commission to declare that it was not a subsidiary company of the American Light and Traction Company, Gardner & Brown, the North American Company, the United Light and Power Company or the United Light and Railways Company.

Gardner & Brown disposed of their stock holdings in the petitioner before the hearing by the Commission, and the Commission found the petitioner was not a subsidiary of the United Light and Power Company.

The American Light & Traction Company is a subsidiary of the United Light and Railways Company, which in turn is a subsidiary of United Light and Power Company. The American Light and Traction Company owns and controls 20.27% of petitioner's outstanding voting stock and the North American Company owns 19.28% of its outstanding voting stock, the latter company only being involved in these proceedings. After hearing before a Trial Examiner, at which testimony was taken, the Trial Examiner filed his report and findings of fact with the Commission. Petitioner filed exceptions thereto, and there-after the matter was orally argued before the Commission. The Commission filed its opinion together with an order granting the application conditionally with respect to the United Light & Power Company, but denied such application with respect to the North American. The findings of the Commission on which its order is based are substantially as follows:

In 1902, White, then a vice president of North American, proposed to Alex Dow, former president of petitioner and now a director, then manager of the Edison Illuminating Company and the Peninsular Electric Light Company, both of Detroit, Michigan, and being the principal electric utilities companies operating in that city, that the stock of both companies be sold to North American Company, a holding company of New York. Dow and the president of Edison Illuminating Company constituted themselves a committee to study the offer and urged the stockholders to accept it, which they did and North American, acting through a syndicate, which was formed for the purpose, acquired all the stock of both companies.

North American paid Dow for his services in connection with the purchase of the Edison Illuminating Company $10,000

vice whatsoever, (ii) the applicant is not an intermediary company through which such control of another company is exercised, and (iii) the management or policies of the applicant are not subject to a controlling influence, directly or indirectly, by such holding company (either alone or pursuant to an arrangement or understanding with one or more other persons) so as to make it necessary or appropriate in the public interest or for the protection of investors or consumers that the applicant be subject to the obligations, duties, and liabilities imposed in this chapter upon subsidiary companies of holding companies. The filing of an application hereunder in good faith shall exempt the applicant from any obligation, duty, or liability imposed in this chapter upon the applicant as a subsidiary company of such specified holding company until the Commission has acted upon such application. Within a reasonable time after the receipt of any application hereunder, the Commission shall enter an order granting, or, after notice and opportunity for hearing, denying or otherwise disposing of, such application. As a condition to the entry of, and as a part of, any order granting such application, the Commission may require the applicant to apply periodically for a renewal of such order and to file such periodic or special reports regarding the affiliations or intercorporate relationships of the applicant as the Commission may find necessary or appropriate to enable it to determine whether in the case of the applicant the conditions specified in clauses (i), (ii), and (iii) are satisfied during the period for which such order is effective. The Commission, upon its own motion or upon application, shall revoke the order declaring such company not to be a subsidiary company whenever in its judgment any condition specified in clause (i), (ii), or (iii) is not satisfied in the case of such company, or modify the terms of such order whenever in its judgment such modification is necessary to ensure that in the case of such company the conditions specified in clauses (i), (ii), and (iii) are satisfied during the period for which such order is effective. Any action of the Commission under the preceding sentence shall be by order. Any application under this paragraph may be made by the holding company or the company in respect of which the order is to be entered, but as used in this paragraph the term 'applicant' means only the company in respect of which the order is to be entered."

and agreed he would be employed to manage the Detroit properties by that Company, or a new one to be organized. This agreement disclosed the anticipation that Dow would remain indefinitely in the service.

On January 17, 1903, North American caused the incorporation of petitioner and its first organization meeting was held in the offices of North American, and its officers and directors, all designated by North American, were duly installed. The legal details of the incorporation and organization were handled for North American by Sullivan & Cromwell, then, and now, its general counsel.

At the organization meeting North American, on behalf of its syndicate, offered to sell petitioner all the stock of the Illuminating and Peninsular Companies, real estate at Delray, Michigan, plans and specifications for an electric generating plant and the right to contracts for the construction of such plant, also to provide petitioner $1,190,000 in cash for construction purposes, the consideration being $3,-000,000 of Edison's first mortgage 30-year, 5 percent bonds, 50,000 shares of its capital stock and the right to suggest changes in the construction plans, which offer was accepted at the first meeting of the board of directors. The syndicate was then dissolved and North American retained 14.73 percent of the petitioner's outstanding voting securities, which holdings have since fluctuated from a low of 6.45 percent in 1924 to a high of 23.52 percent in 1931.

Petitioner's board of directors has, from its incorporation, consisted of nine members, the first of whom were selected by North American and were Messrs. Wetmore, Sheldon, Bulkley, White, Coffin, Jaretski, Dow, Russell and Bowen, the first three then being directors and members of the executive committee of North American and White a vice president who had suggested the deal between petitioner and North American. Wetmore, who was petitioner's first president was also president of North American. Jaretski was a partner in the law firm of Sullivan & Cromwell, general counsel for North American, Dow, manager of the underlying properties and to whom North American had paid $10,000 for his services to the syndicate. Coffin was president of General Electric Company and became a director of North American in 1905, in which capacity he served that company and also

the petitioner until 1920. Russell and Bowen were Detroit businessmen with minor financial interests in petitioner.

The original board served until 1908 when Smithers, a director of North American and member of its executive committee, replaced White. In 1910 Russell was succeeded by Caufield, a friend of Wetmore. The next change was in 1912 when Caufield was replaced by Campbell, the then president of North American. In 1912 Wetmore retired as petitioner's president and Dow was elected to that office. In 1913 Wetmore was succeeded on the board by Jenks, a Detroit businessman. Marshall, who had been associated with Dow in the early days of the Illuminating Company, was elected petitioner's vice president in 1913 which position he held until 1940. In 1914 Campbell was replaced by Mortimer on petitioner's board of directors, and also as president of North American. In 1915 Dow became a director of North American and a member of its executive committee, which posts he held until 1921.

Four changes occurred in 1920: Williams succeeded Mortimer as chief executive of North American and replaced him as a member of petitioner's Board; Fogarty, an officer and director of North American, was elected a director but soon resigned and was succeeded by Marshall, vice president of petitioner and Coffin was replaced by Rice, who then was president of General Electric Company.

In 1923 Williams retired as North American's chief executive officer and was replaced on petitioner's board by the then vice president, Gruhl. In that year also Pomeroy was succeeded by Close, a director of Bankers Trust Company. In 1926 Jaretski was succeeded by Victor, a partner in the law firm of Sullivan and Cromwell. The following year Victor was replaced by Dulles, another member of the Sullivan and Cromwell partnership, and who, from 1930 to 1938, was a North American director. Gruhl died in 1932 while president of North American and was succeeded by Dame, both as North American president and director of petitioner, who soon died and was succeeded by Fogarty in both posts. In 1936 Rice was replaced by Gushee, a member of petitioner's operating staff. Just prior to the hearing by the Commission, Gushee was given a leave of absence by petitioner and resigned as director to accept employment

with Union Electric Company of Missouri, a subsidiary of North American.

Of the nine members of the Board which originally elected Dow president, seven had been initially designated as directors of petitioner by North American and two were the president and a director of North American. In 1940 Dow was succeeded as president by Marshall, petitioner's vice president and an associate of Dow in the old Illuminating Company, but continued to act as a director. The same board of directors that elected Dow president, originally named Marshall as vice president.

Of the eight directors presently serving petitioner, Bulkley and Dow have served continuously since North American chose them on the first board; Fogarty, a third member, is North American's president, Dulles is a partner in the law firm of Sullivan and Cromwell, general counsel to North American in legal matters pertaining to petitioner's organization and general counsel for petitioner. Holden and Seyburn, two of the other directors are Detroit businessmen, another Tompkins, a director in Bankers Trust Company and Marshall is president of petitioner.

The personal stockholdings of petitioner's directors and of its officers are negligible. None of petitioner's stockholders, other than North American, ever appear to have designated any of petitioner's officers or directors and none of petitioner's officers or directors appear to have had any relationships to any substantial stockholder of petitioner except North American.

A chronological statement of the succession of petitioner's presidents and directors indicates that since its organization in 1902, North American has maintained a position of importance and influence in the affairs of petitioner based on stock ownership or historical association or both. Two members of the present board trace their association with petitioner to their initial designation as such by North American while two others are directly associated with North American at the present time. Petitioner's present president, also a director, was selected as its vice president by a board made up in its entirety of North American selection or affiliation. At least half, and perhaps a majority, of the present board are either associated with North American or derive their connection with petitioner from North American.

The syndicate of 1902 which, under the auspices of North American, organized the petitioner, seems to have had a continuing position in its affairs. Of the $41,984,000 bonds issued by petitioner from 1904 to 1921, approximately $33,565,500 were underwritten by the three investment firms which were among the more important participants in the syndicate. The same three firms headed each of the eleven underwriting groups that distributed $218,016,000 of petitioner's bonds between 1924 and 1938.

The petitioner in 1920 authorized the issuance of approximately 55,000 shares of its stock which, under Michigan law, was required to be sold at par, but because of the instability of market conditions at the time, none could be sold at that price. In 1921, petitioner sold 27,000 of these shares to North American at par, or $100 per share, for public distribution, the petitioner agreeing to pay $7 commission for each share sold up to 20,000 and $3 a share for the balance. North American was also given an option to purchase 3,000 shares at the same price, to be distributed without commission. Petitioner and North American agreed to work together for as useful and widespread a market for the stock as possible. In 1922, North American marketed the 27,000 shares and received $161,000 from petitioner in commissions. North American disposed of the stock, however, at more than par and realized a net profit on the transaction of approximately $212,000. It exercised its option to purchase the additional 3,000 shares but retained them for its own portfolio, petitioner waiving the distribution requirement.

In 1923, petitioner again offered to the public 35,423 additional shares of its stock, which was underwritten by a syndicate headed by Bankers Trust Company. This group included North American and two of the three investment houses which headed the bond syndicates. In 1924, petitioner offered 14,863 more shares and Bankers Trust Company again led the syndicate which included the same two investment houses. North American did not participate, although invited.

From the time of petitioner's organization, to 1935, North American served as its fiscal agent; since that time Bankers Trust Company has so acted. Petitioner has always maintained offices in New York which have been located in North American's building at all times, except from 1909 to

1912. For some years petitioner participated with North American and its acknowledged subsidiaries in joint purchasing contracts. The petitioner withdrew from such arrangements in 1929 when its own purchasing power entitled it to similar discounts.

For many years petitioner has designated representatives to the Station Advisory Committee, an organization consisting of a group of engineers meeting to exchange ideas on operating methods, costs of properties and technical developments. All other companies participating in the activities of the committee are statutory subsidiaries of North American.

Prior to 1925, United Light and Power Company held none of petitioner's stock. In that year it began to make substantial purchases in the open market and by 1926 controlled 6.34 percent of the outstanding voting stock. By 1931, United held as much of petitioner's stock as did North American, which condition has continued to the present.

From 1925 to 1931, North American also made substantial purchases of petitioner's stock, its holdings having dropped to the lowest level in 1924. In 1926, United suggested to petitioner that, as a substantial stockholder, it was entitled to representation on its board, but petitioner's management refused to recognize merit in the suggestion and United was not given representation.

In 1932, United had increased its holdings to 20.26 percent of petitioner's voting securities and again requested representation on its board and again was refused. This occurred also in 1934, and in 1935 an effort was made to force recognition by attempting to break quorum, but it met with no success and United at the present has no representation on the board and does not participate in petitioner's affairs.

From these facts, the Commission concluded that in the light of petitioner's origin and the unbroken continuity of North American's officers, directors and designees on petitioner's board, that it had failed to carry the burden of proof that it was not a subsidiary of the North American Company, or that it was not necessary and appropriate in the public interest and for the protection of investors and consumers, that the petitioner be subject to the obligations, duties and liabilities imposed by the present act upon subsidiary companies of registered holding companies.

The petitioner attacks the Commission's order on the following grounds: (1) That the primary evidence, including all reasonable inferences, deductions and conclusions to be drawn therefrom and considering them in their entirety and relation to each other, sustains the burden of proof resting on petitioner to show there was neither control nor controlling influence over its affairs by the North American Company and further, if it exercised any influence over the petitioner it was not harmful to the public, investors or consumers; (2) That the findings of fact by the Commission do not support its order; (3) That the present order is invalid for lack of due process, because the Commission did not find jurisdictional facts, did not decide essential questions of law, and did not rule upon petitioner's request for findings and its exceptions presented to the intermediate report of the Examiner; (4) That the order is invalid because the petitioner is not subject to the provisions of the Act in question.

■ The statute conferring jurisdiction on this court to review the present order authorizes it to affirm, modify or set aside such order in whole or in part. 15 U.S.C.A. 79x, 49 Stat. 834. Upon such a review the Commission's findings of fact are conclusive if supported by evidence, but the court may examine the whole record and ascertain for itself whether there are material facts not reported by the Commission and if there be substantial evidence relating to such facts from which differing conclusions may be drawn and the interests of justice require that the controversy be settled without further delay, the court has full power under the statute to do so without referring the matter to the Commission for additional findings. Federal Trade Commission v. Curtis Publishing Company, 260 U.S. 568, 580, 43 S.Ct. 210, 67 L.Ed. 408.

■ Since the primary facts in the record present no substantial dispute and the inferences, deductions and conclusions to be drawn therefrom are not substantially variable, we consider all the facts in determining the appropriateness of the questioned order. This necessitates the statement of additional important primary facts, some of which petitioner claims the Commission did not duly weigh in its findings of ultimate facts. At the time of the hearing, petitioner was engaged exclusively in the business of furnishing light and power and

rendering incidental public services to the Detroit, Michigan, area. It had a capital structure of $350,000,000 with outstanding capital stock, all of one class, of $127,-226,000, with equal voting rights, none of it within a voting trust and with no charter or statutory provision for cumulative voting. It owns directly all of its properties and franchises and is subject to regulation by the Michigan Public Utilities Commission. It generates its own electric energy, manufactures its own gas, makes its own steam and does its own buying of equipment, material, supplies and miscellaneous articles.

Prior to August 26, 1935, the date of the passage of the Public Utility Holding Act, the North American Company received $45,000 annually from 1925 until 1935, for acting as fiscal agent for petitioner. All of the business of petitioner transacted in the State of New York during this period was carried on in the offices of North American. For the sole purpose of avoiding the application of the Public Utility Holding Act, petitioner, in November, 1935, discontinued the use of the North American Company's offices and established its own on a different floor in the same building and put in charge thereof a former employee of the North American, who thereafter discontinued his connection with it. All officers of petitioner who were also officers of the North American Company at that time, resigned and petitioner's stock ledgers, its printed proxies and annual reports to stockholders were removed from the North American offices to petitioner's new offices and thereafter no mail was either sent or received for petitioner through the North American offices. It also thereafter discontinued all interoffice relationship with the North American and by mutual consent, all existing contracts or inter-related services between the two companies were abandoned.

In 1924, when the United Light & Power Company went into the open market to purchase the shares of the petitioner with the object of influencing its affairs, petitioner's president, Alex Dow, issued a statement to the Wall Street Journal, which was also carried on the ticker of the New York Stock Exchange, wherein he publicly called attention to the fact that a holding company was seeking to acquire control of petitioner and if such holding company could buy control at $150 per share, which he doubted, it would mean an investment by the purchasers of $20,000,000 more than had gone into petitioner's property and the purchasers would not get a return upon their money. Immediately after this statement, North American Company went into the open market and bid against the United Light and Power Company and purchased shares of petitioner's stock at prices ranging from $130 to $212 per share.

The petitioner's stock is widely distributed, both in this country and abroad. It is, and has been, the practice of the company to organize a proxy committee each year named by its directors, under the form of which the committees have always been instructed to vote for retiring directors if they were available. Between 1903 and 1910, an average of 80% of stockholders' votes cast at meetings were by proxy and since that time the percentage has varied from 90% to 100%.

Petitioner is a strong, successful and well-managed institution and bears an excellent reputation in the communities where it does business, for honesty and fair dealing with its investors, employees and consumers. Its executive officers devote all their time to the affairs of petitioner and at the time of the hearing had no official connection with the North American Company.

It is conceded by the parties that the North American Company is a registered holding company under Section 2(a) (7) of the Act and the undisputed facts show that petitioner is prima facie a subsidiary of the North American Company under the provisions of 2(a) (8) (A) of the Act. Under this section, a subsidiary may be exempted from the provisions of the Act if the Commission shall by order declare that such subsidiary is not controlled, directly or indirectly, by a parent company, either through one or more intermediary persons or by any means or device; that the applicant is not an intermediary company through which such control of another company is exercised, and that the management or policies of the subsidiary are not subject to a controlling influence, directly or indirectly, by a parent company (either alone or pursuant to an arrangement or understanding with one or more other persons) so as to make it necessary or appropriate in the public interest, or for the protection of investors or consumers that the subsidiary be subject to the provisions of the Act.

738

There is no evidence in the record that petitioner is controlled, directly or indirectly, by the North American Company, either through one or more intermediary persons or by any means or device whatsoever, and likewise there is no evidence in the record that petitioner is an intermediary company through which such control of another company is exercised. Therefore, the single question is, did the petitioner carry the burden of proof resting on it to show that neither its management nor policies were subject to the controlling influence, directly or indirectly, of the North American Company, so as to make it necessary in the public interest that it be subject to the provisions of the Act.

We are here dealing, not with an abstract idea, but a concrete rule adopted by Congress for the guidance of business enterprises which affect the economic organization of our society.

■ The Act should be so construed that those affected by it may be certain of the rules of conduct required of them under its provisions. Because of the imperfection natural in language and the obscurity and confusion so difficult to avoid in the use of words, it is sometimes hard to determine the exact meaning of phrases or words used in statutes. The words and phrases used in the present Act should have a rational construction with common sense and the Act as a whole should be construed to carry out the purpose of the Congress in its enactment. Because of the nature of the complex subject with which the Congress was dealing, it could not promulgate a Code so specific as to adapt itself to all possible contingencies and evils, which it was seeking to prevent or regulate. It was therefore necessary to delegate power to the Commission with broadly defined limits to determine the controlling relationship between holding companies and their subsidiaries.

■ The most rational method of interpreting the will of Congress is by exploring its intention at the time the questioned law was made, by signs the most natural and probable; and these signs are either the words, the context, the subject matter, the effect and consequences, or the spirit and reason of the law. With respect to the words, they are generally understood in their usual and most ordinary signification, not so much regarding their grammar as their general and popular use. The phrase "controlling influence" varies in its meaning according to circumstances, and the rule applies that where the meaning of a phrase is dubious in any setting, we may establish the meaning by the context.

At the time of the enactment of the present statute, it was recognized by the Congress that the holding company was the most effective device theretofore used for combining, under single control and management, the properties of two or more hitherto independent corporations and it is also recognized that such companies were largely exempt from state regulation, because in many cases, they extended their activities beyond the jurisdiction of any one state. It also recognized the separation of ownership of property represented by securities emitted by corporations or trustees, from any direct accountability whatever for its prudent and efficient management. It also recognized that underlying public utility corporations were frequently controlled through pyramided corporate structures, the top corporation often having but a small investment in the capital structure of the underlying operating company, but through control of directors was enabled to direct the use of the assets and earnings of subsidiaries.

■ The Congress recognized the necessity in the public interest of the regulation of public utility holding companies and their subsidiaries, such regulation by the states, in its judgment being inadequate. It also found as a fact that internal and private control over the operation of the business of such enterprises, had in some cases resulted in serious loss to the holders of their securities, deterioration of their physical properties and a marked impairment of the ability of such institutions to perform their functions as public servants. 15 U.S.C.A. § 79a, 49 Stat. 803; Electric Bond & Share Company v. Securities & Exchange Commission, 303 U.S. 419, 442, 58 S.Ct. 678, 82 L.Ed. 936, 115 A.L.R. 105. It proposed to support, as far as possible, the form of such a company on one side and on the other to take precautionary measures to prevent abuses, and to this end it took under public supervision both the good and bad. The present Act undertakes to bring within its ambit all subsidiaries subject to "controlling influence" of a parent. This phrase should be construed in the light of the purpose of the Act of which it is a part, and when understood in this setting and in the light of its ordinary

signification, it means the act or process, or power of producing an effect which may be without apparent force or direct authority and is effective in checking or directing action, or exercising restraint or preventing free action. The phrase as here used, does not necessarily mean that those exercising controlling influence must be able to carry their point. A controlling influence may be effective without accomplishing its purpose fully.

Corporate wealth has become so widely distributed that control over it has tended to become more and more remote from ownership. Ownership of corporate shares without appreciable corporate control and control of corporate wealth without appreciable ownership has become a natural phenomenon of our economic system. Seven major types of corporate control were extant when the present Act was passed and others may develop from the urge of individuals to avoid public regulation. Congress recognized this condition, and the present Act imposes a wide discretion in the Commission in determining what is "controlling influence" of a parent over a subsidiary public utility. However, this part of the present Act has its guide post, which prevents the Commission from exercising arbitrary power in enforcing it.

The types of control referred to are: (1) through complete ownership of capital stock, (2) a majority ownership, (3) through a legal device without majority ownership, such as pyramiding through holding companies or a large issue of non-voting stock with a comparatively small issue of stock with voting rights, or voting trusts, (4) minority control, which exists when comparatively few shares of corporate stock are in the hands of one group and the remainder widely scattered, (5) management control, which exists where all the stock is so widely distributed that no stockholder takes sufficient interest in the affairs of the corporation to influence or control it, (6) proxy control through committees, (7) through interlocking corporate officers or directors.

The evidence in the case at bar shows marked features and significant incidences of the latent power of the North American Company to exercise a controlling influence over the petitioner. Compare Natural Gas Pipeline Company v. Slattery, 302 U.S. 300, 307, 58 S.Ct. 199, 82 L.Ed. 276; United States v. Union Pacific Railroad, 226 U.S. 61, 96, 33 S.Ct. 53, 57 L.Ed. 124; Southern Pacific Company v. Bogert, 250 U.S. 483, 492, 39 S.Ct. 533, 63 L.Ed. 1099; Hyams v. Calumet & Hecla Mining Company, 6 Cir., 221 F. 529; Moulton v. Field, 179 F. 673; Rochester Telephone Corporation v. United States and Federal Communications Commission, 307 U.S. 125, 145, 59 S.Ct. 754, 83 L.Ed. 1147.

The fact that the North American Company had abandoned some of the characteristics of "controlling influence" over the petitioner at the time of the hearing, did not require the Commission to disregard prior interrelated activities. There is no showing that its latent power to resume such control has been extinguished. The relationship is such that they may enter into similar activities in the immediate future. United States v. Trans-Missouri Freight Association, 166 U.S. 290, 308, 17 S.Ct. 540, 41 L.Ed 1007; Labor Board v. Newport News Company, 308 U.S. 241, 60 S.Ct. 203, 84 L.Ed. 219.

Provisos and exceptions in statutes must be strictly construed and limited to objects fairly within their terms, since they are intended to restrain or except that which would otherwise be within the scope of the general language. The burden rested on petitioner to bring itself within the exception. Schlemmer v. Buffalo, Rochester & P. R. Company, 205 U.S. 1, 27, 27 S.Ct. 407, 51 L.Ed. 681.

Petitioner urges on us that the evidence in the record, when fairly appraised and weighed, shows a lack of necessity or appropriateness in the public interest or for the protection of investors or consumers, that it be subjected to the obligations, duties and liabilities of the present Act. To this contention we cannot agree. The phrase "public interest" as used means that the public has some pecuniary interest or an interest by which legal rights or liabilities of its individual members are affected by the operation of the utility. The phrase is not to be construed as requiring the Commission to find that the conduct of the applicant's business has or will affect the public adversely. The statute contemplates action prospectively. It is a preventive measure intended to regulate action before the interests of those concerned are adversely affected. The prime factors in determining statutory exemption are the size and extent of the company involved, the inter-company relationship, the distribution of its securities

and the opportunity presented because of the relationship between the parent and subsidiary for excessive charges for services, construction work, equipment and materials, and the transactions entered into in which evil may result, because of the absence of arms' length bargaining or restraint of free and independent competition. Giving due weight to the past transactions of petitioner with the North American and the continuing opportunity for the resumption of such activities and the extent of the petitioner's business and the widely scattered ownership of its stock, the Commission committed no error in denying petitioner exemption from the present Act.

Petitioner insists that the order of the Commission is void because not supported by jurisdictional findings and urges on us that it is evident from the face of the record that petitioner is not subject to the provisions of the present Act. It predicates this issue on the alleged fact that its business activities are purely intrastate and that the Congress lacked the power to bring it within the ambit of national regulation.

The issue which petitioner seeks to raise is without merit. Its application to the Commission prayed only that it be excluded from the operation of Section 2(a) (8) (A). It did not ask for exclusion from the provisions of the Act in question because of the intrastate character of its business. The petitioner stated in its application to the Commission that the North American owned 19.2% of its outstanding voting stock and that the American Light & Traction Company owned 20.2%. It also stated that each of these companies was a holding company within the terms of the Act. Jurisdictional facts appearing in its application, it was unnecessary for the Commission to make any specific jurisdictional findings. As appears from petitioner's application to the Commission, it is prima facie subject to the provisions of the questioned Act. The presently tendered issue as to the interstate character of its business raises a constitutional question. The well established rule applies that in the exercise of their jurisdiction to consider the constitutionality of a Federal Statute, the United States Courts will not anticipate a question of constitutional law in advance of the necessity of deciding it or formulate a rule of court broader than the precise facts to which it is applied. Liverpool, N. Y. & P. S. S. Company v. Commissioners, 113 U.S. 33, 39, 5 S.Ct. 352, 28 L.Ed. 899; Massachusetts v. Mellon, 262 U.S. 447, 488, 43 S.Ct. 597, 67 L.Ed. 1078; State of Texas v. Interstate Commerce Commission, 258 U.S. 158, 162, 42 S.Ct. 261, 66 L.Ed. 531; Tennessee Publishing Company v. American Nat. Bank, 299 U.S. 18, 22, 57 S.Ct. 85, 81 L.Ed. 13.

The petitioner has asked for a declaration of status under the provisions of the statute. This is incompatible with a challenge to its validity. The party who invokes the power to review and annul Acts of Congress must be able to show that he has sustained, or is immediately in danger of sustaining, some direct injury as the result of its enforcement. Until some order of the Commission adversely affects the petitioner a challenge to constitutional validity is premature. City of Allegan v. Consumers' Power Company, 6 Cir., 71 F.2d 477; East Ohio Gas Company v. Federal Power Commission, 6 Cir., 115 F.2d 385.

Petition denied.