SECURITIES AND EXCHANGE COM-
MISSION, Appellant,

v.

INSURANCE SECURITIES, Incorporated, Trust Fund Sponsored by Insurance Securities, Incorporated, Abe P. Leach, Ossian E. Carr, Arthur J. Lonergan, Roy A. Haight, and Leland M. Kaiser, as Attorney and Proxy for Investors of Trust Fund, Appellees.

No. 15457.

United States Court of Appeals
Ninth Circuit.

April 7, 1958.

Thomas G. Meeker, Gen. Counsel, Aaron Levy, Sp. Counsel, Jule B. Greene, Atty., S. E. C., Washington, D. C., F. E. Kennamer, Jr., Atty., S. E. C., San Francisco, Cal., for appellant.

Brobeck, Phleger & Harrison, Moses Lasky, Philip S. Ehrlich, San Francisco, Cal., Elwood Murphey, Oakland, Cal., Sullivan & Cromwell, Alfred Jaretzki, Jr., New York City, for appellees.

Before STEPHENS, Chief Judge, and LEMMON and HAMLEY, Circuit Judges.

HAMLEY, Circuit Judge.

The sale of stock of a company which acts as investment advisor and principal underwriter of an investment company gave rise to this action. Attacking this transaction, the Securities and Exchange Commission (Commission) brought this action for injunctive relief and an accounting. Authority to bring the suit, and the jurisdiction of the district court to entertain it, were asserted under §§ 42(e) and 44 of the Investment Com-

pany Act of 1940 (act), 15 U.S.C.A. §§ 80a–41(e) and 80a–43.

Named as defendants were Insurance Securities, Incorporated (service company), and "Trust Fund Sponsored by Insurance Securities, Incorporated," (Trust Fund). Also named as defendants were Abe P. Leach, Ossian E. Carr, Arthur J. Lonergan, Roy A. Haight (stockholders and directors of the service company), and Leland M. Kaiser, "as Attorney and Proxy for Investors of Trust Fund."

In a first cause of action, it is alleged, in effect, that defendant-directors of the service company sold a controlling interest therein to a small group of affiliated purchasers at a price greatly in excess of the net book value of the stock sold. This action, according to the amended complaint, constituted "gross misconduct" and "gross abuse of trust," within the meaning of § 36 of the act, 15 U.S.C.A. § 80a–35.

In a second cause of action, it was alleged that certain proxy solicitation materials, issued in connection with a meeting of investors called to review the service contract after this stock transaction, were false and misleading. This was asserted to be in violation of § 20(a) of the act, 15 U.S.C.A. § 80a–20(a), and of the Commission's rules.

Defendants filed a motion to dismiss both causes of action for failure to state any claim for relief. At the same time, defendants filed nine affidavits in support of this motion and in support of, or in opposition to, other motions pertaining to temporary injunctive relief. The Commission filed counteraffidavits. After a hearing, the trial court filed an opinion stating that the motion to dismiss would be granted. An order to this effect was entered on December 4, 1956. The Commission appeals.

The action of the trial court in dismissing the suit was based solely upon a consideration of the allegations of the amended complaint. The court held that the first cause of action fails to state a claim upon which relief can be granted. The reason given for reaching this con-clusion was that the transaction, as described in the pleading, does not fall within the reach of § 36 of the act. It was further held that the second cause of action fails to state a claim upon which relief can be granted, because it is dependent upon a claim for relief being stated in the first cause of action.

The first and principal question presented on this appeal is whether the trial court was correct in ruling that the transaction, as alleged in the amended complaint, does not fall within the reach of § 36 of the act. Determination of this question requires us to accept, as the hypothesis for our decision, the well-pleaded facts alleged in the amended complaint. Collins v. Hardyman, 341 U.S. 651, 652, 71 S.Ct. 937, 95 L.Ed. 1253. These alleged facts are set out in the immediately succeeding paragraphs of this opinion.

The service company was organized on March 9, 1938, under the laws of California. Its principal business office is located in Oakland, California. Since 1938, appellees Leach, Carr, Lonergan, and Haight have been and now are directors of that company. In addition, Leach was president of the company at the time this action was begun. Carr and Lonergan were and still are vice presidents, and Haight is secretary. All four were members of the executive committee of the company. Appellee Kaiser is a director, and, at the time the action was begun, was vice president of the company.

The service company is the sponsor, depositor, investment adviser, and principal underwriter of Trust Fund, and has no other business. Trust Fund was organized in accordance with California law under the terms of a trust agreement dated July 1, 1938, and as subsequently amended. Trust Fund maintains its principal office in Oakland, California. It is an open-end diversified management company, within the meaning of §§ 4 and 5 of the act, 15 U.S.C.A. § 80a–4 and 5. It is registered as such with the Commission, pursuant to § 8(b) of the act, 15 U.S.C.A. § 80a–8(b).

Trust Fund derives its capital funds from continuous offerings to public investors of participation agreements. The net receipts are invested by Trust Fund in stocks of various insurance companies. As of December 31, 1955, net assets of Trust Fund amounted to approximately $215,000,000.

At the time this action was begun, Trust Fund had no officers or directors of its own.[1] Management functions were discharged by the service company as sponsor and investment adviser of Trust Fund.

The service company receives a "creation fee," or sales load, for the sale of participation agreements. It also receives a fee for administering Trust Fund, and management and investment supervisory fee for investment advice. The service company received fees for such services in the aggregate amounts of $2,111,777, $3,319,567, and $4,798,507 for the fiscal years ending June 30, 1953, 1954, and 1955, respectively.

Investors in Trust Fund have no general voting rights except in the particular circumstances specified in the trust agreement. This agreement provides, as required by the act, that Trust Fund's advisory and principal underwriting contracts must be approved annually by a vote of investors representing a majority of investment units of Trust Fund. See § 15(a) (2) and (b) (1) of the act, 15 U.S.C.A., § 80a–15(a) (2) and (b) (1).

The trust agreement also provides, as required by the act, that an assignment of the contract to serve as investment adviser for Trust Fund, or of the contract to serve as principal underwriter for the securities of Trust Fund, auto-

matically terminates such contracts. See § 15(a) (4) and (b) (2) of the act, 15 U.S.C.A. § 80a–15(a) (4) and (b) (2).[2]

On January 1, 1956, and for some years prior thereto, the service company had outstanding 166 shares of capital stock, one-hundred-dollar par value. This stock was closely held, seventy-two per cent being held, in the aggregate, by director-appellees Leach, Carr, Lonergan, and Haight. On June 29, 1956, the capital stock was split into 166,000 shares, ten-cent par value. All further reference to the capital stock of the service company will be stated in terms of number of shares outstanding after the June 29, 1956, split.

On January 1, 1956, each of the director-appellees owned 30,000 shares, or eighteen per cent, of the 166,000 shares outstanding. The balance of the stock was held by five individuals (not parties to this action) in amounts ranging from 0.6 per cent to 16 per cent of the total shares outstanding.

On February 1, 1956, the four director-appellees, either alone or in concert with others, embarked upon a plan to transfer control of the service company to a small number of purchasers affiliated among each other through stock ownership and otherwise. This was to be accomplished by selling to such purchasers a substantial part of their respective stock interests in the service company. Most of these sales were arranged through Kaiser & Co., investment bankers in San Francisco, California. Appellee Kaiser, a member of the firm, was, at the time this action was begun, a director and vice president of the service company. He was also designated as one of the attorneys and proxies for the in-

---

1. As indicated in the exhibits attached to the amended complaint, however, the service company had called a meeting of the investors of Trust Fund, to be held on August 15, 1956, at which a proposed amendment of the trust agreement, creating a board of directors for Trust Fund, was to be submitted for adoption. While immaterial to the issues under consideration here, the affidavits filed in this cause indicate that the proposed amend-

ment was adopted and put into effect on September 17, 1956.

2. Section 2(a) (4) of the act, 15 U.S.C.A. § 80a–2(a) (4), defines the term "assignment" to include

"* * * any direct or indirect transfer * * * of a contract * * * by the assignor, or of a controlling block of the assignor's outstanding voting securities by a security holder of the assignor."

vestors at the meeting of investors called to consider proposed amendments to the trust agreement, and other matters.[3]

The total shares of the capital stock of the service company sold to the purchasers between February 1, 1956, and July 1, 1956, amounted to 88,000 shares, or fifty-three per cent of the shares outstanding. During the same period, the director-appellees sold 68,000 shares, as follows: Leach, 29,000; Carr, 13,000; Lonergan, 13,000; Haight, 13,000. The four director-appellees thus reduced their aggregate stock interest in the service company from seventy-two per cent to 31.2 per cent. The amount thereby transferred to the purchasing group amounted to about 40.8 per cent of the total outstanding. The balance of approximately thirteen per cent was purchased from the other individual holders.

The price paid for the stock was fifty dollars per share. The balance sheet of the service company shows that, as of June 30, 1956, the stockholders' equity in this company was $300,489, or $1.81 per share. The aggregate price for the total shares sold was approximately $4,240,720 in excess of their net book value. The purchase price therefore necessarily reflected the value which the service company does and will derive from the fees paid, and expected to be paid, by Trust Fund.[4]

On July 17, 1956, the service company sent to the holders of participating agreements in Trust Fund a notice of the meeting of investors to be held on August 15, 1956. Transmitted with this notice was a notice of proposed supplemental agreements with copy of the proposed supplemental trust agreement attached thereto; a proxy statement covering the matters to be dealt with at the meeting of investors; and a proxy to be signed and returned by the individual investors.

The proxy statement indicated that, in the event the proposed amendment of the trust agreement creating a board of directors for Trust Fund was adopted, it was proposed to elect, as members of that board, seven named persons who were then directors of the service company. These included appellees Leach, Kaiser, and Haight. It was indicated that these appellees would also continue as members of the board of the service company, but that the other four members of the new board would resign as directors of the service company.

The proxy statement further indicated that, unless the investor specified otherwise on his proxy ballot, the units represented by such proxy would be voted in favor of the proposals referred to in the notice of meeting. This included the proposal to reinstate the investment advisory and principal underwriting contracts between the service company and Trust Fund in the then-existing form, except as affected by the creation of a board of directors of Trust Fund.[5] The

---

3. Kaiser has since become, and still is, president of the service company. He was apparently joined as a defendant only because he was one of the proxy holders in connection with the meeting of investors referred to above. In its second cause of action, the Commission sought to enjoin the voting of these proxies. The proxies were thereafter voted when the interlocutory restraining order was dissolved.

4. It is stated in the amended complaint, as a conclusion, that the payment of twenty-five times the net asset value "represented no payment for any asset or assets owned by" the service company. The conclusion is also stated that the "value attached to said contracts (between Trust Fund and the service com-

pany) is an asset of the Trust Fund, and in law and equity is preserved for the benefit of such Trust Fund."

5. These contracts, according to the Commission, had been automatically terminated, under the act, by reason of the transfer of control of the service company. It is stated in the amended complaint, as a conclusion, that:
   "* * * By obtaining reinstatement and confirmation of said contracts, the purchasers of the controlling stock interest in Insurance Securities would be assured of the benefits of said contracts, for which they paid substantial sums, and the director-defendants would be assured of their inequitable profits as a consequence of the sale of such contracts.

three persons named as attorneys and proxies in the ballots sent to the investors were appellees Leach, Kaiser, and Haight.

The relief sought by the Commission under the first cause of action is as follows: (1) An injunction permanently enjoining the individual appellees from serving as officers and directors of the service company, and from serving as directors of the proposed board of directors of Trust Fund; (2) an injunction permanently enjoining the service company from acting as investment adviser and principal underwriter of Trust Fund; (3) an order requiring that, until final determination of the action, the amount of fees to be charged by the service company for its investment advisory and principal underwriting services in excess of actual costs or expenses thereof, be segregated and maintained in a separate account; and (4) that an accounting be rendered by director-appellees for the "inequitable and wrongful" profits realized, and to be realized, as a consequence of the sale of their stock of the service company.[6]

As before stated, the cause of action under examination is based upon the theory that the service company and its director-appellees were guilty of "gross misconduct" and "gross abuse of trust," within the meaning of § 36 of the act.[7]

The trial court held that this section is not applicable, because the amended complaint "makes no charge of any misconduct or abuse of trust, gross or otherwise, with respect to Trust Fund or its investors." Appellant takes issue with this conclusion of the trial court.

Appellant does not contend that every sale of a controlling interest in an investment company's investment adviser or principal underwriter necessarily constitutes "gross misconduct" or "gross abuse of trust," with respect to the investment company. It is conceded that such a sale, if made at net asset value, is proper, even though the advisory or underwriting agreement is thereby terminated under § 15(a) (4), 15 U.S.C.A. § 80a–15(a) (4).

Appellant argues, however, that when the sale of control of the investment adviser or principal underwriter involves receipt of consideration in excess of net asset value, "gross misconduct" or "gross abuse of trust," under § 36 is involved. The excess, it is contended, represents payment for succession to the adviser's or underwriter's fiduciary office and undertakings.[8]

It is also appellants' position that the value attached to service contracts is an asset of the investment company. The stockholders of an investment adviser

---

"By reason of the foregoing, the director-defendants and Insurance Securities are guilty of 'gross misconduct' and 'gross abuse of trust' within the meaning of Section 36 of the act."

6. Relief sought in the form of temporary and permanent injunctions directed against the voting of proxies at the meeting of Trust Fund investors, scheduled for August 5, 1956, appears to be based upon the allegations stated in the second cause of action.

7. Section 36 of the act reads as follows:
"The Commission is authorized to bring an action in the proper district court of the United States or United States court of any Territory or other place subject to the jurisdiction of the United States, alleging that a person serving or acting in one or more of the following capacities has been guilty, after August 22, 1940,

and within five years of the commencement of the action, of gross misconduct or gross abuse of trust in respect of any registered investment company for which such person so serves or acts:
"(1) as officer, director, member of an advisory board, investment adviser, or depositor; or
"(2) as principal underwriter, if such registered company is an open-end company, unit investment trust, or face-amount certificate company.
If the Commission's allegations of such gross misconduct or gross abuse of trust are established, the court shall enjoin such person from acting in such capacity or capacities either permanently or for such period of time as it in its discretion shall deem appropriate."

8. This is undesirable, according to appellant, because it encourages the transfer of controlling interests in service compa-

having such a contract may not, according to this view, appropriate this asset to themselves by selling a controlling stock interest in the service company for a price in excess of asset value.

It is for these reasons, appellant contends, that the sale of a controlling interest in a service company at a price in excess of asset value is contrary to general equitable principles. These principals, it is urged, are incorporated in § 36 of the act. Appellant argues that the facts alleged in the amended complaint disclose a transaction of this kind, and call for the relief requested.

The specific question presented by appellant's argument is whether transfer of control of an investment adviser and principal underwriter at a price in excess of net asset value constitutes "gross misconduct or gross abuse of trust in respect to" an investment company which it serves, within the meaning of § 36 of the act.[9]

█ The act contains no general definition of these terms nor any provision to the effect that acts of a particular kind are comprised therein. The terms, however, are obviously intended to have some meaning and application. We must therefore find it by examining the scope and content of the act as a whole, and the pertinent legislative history. As the Supreme Court has said, when terms in a statute are not exactly defined, they "derive much meaningful content from the purpose of the Act, its factual background and the statutory context in which they appear. * * *" American Power & Light Co. v. Securities and Exchange Commission, 329 U.S. 90, 104, 67 S.Ct. 133, 142, 91 L.Ed. 103.[10]

Section 1(b) of the act, 15 U.S.C.A. § 80a–1(b), contains a factual recital to the effect that the national public interest and the interest of investors are adversely affected when any one of eight described conditions exist. The only one of these described circumstances which is relevant to the first cause of action is that which is set out in subdivision (6) of this section.[11] This subdivision reads:

"(6) when investment companies are reorganized, become inactive, or change the character of their business, *or when the control or management thereof is transferred, without*

---

nies without regard to the best interests of the investment company. The "excess value" paid in connection with such a transfer, it is argued, may also prompt the new controlling interests to pursue a hazardous or doubtful policy in an effort to recoup the purchase price.

9. As so framed, the question assumes, for the purposes of argument, that, under the facts alleged, the control of the service company was transferred, and that this was accomplished by persons of the class specified in § 36.

10. Our task is not to delineate the full breadth of meaning these terms may have, but only to determine whether they embrace acts of the kind here alleged.

11. Subdivision (1) relates to inadequacy or inaccuracy of information made available to investors. Subdivision (2) condemns organization, operation, or management of investment companies, or the selection of their portfolio securities, in the interests of the fiduciary instead of the security holders. As the trial court pointed out, no claim is made in the amended complaint, or otherwise, that the business of Trust Fund has not been conducted efficiently and honestly. Nor is there any claim that the investors have suffered any loss or damage with respect to their interest in Trust Fund by reason of any act or conduct described in the amended complaint.

Subdivision (3) deals with inequitable or discriminatory provisions contained in securities, and failure to protect the preferences and privileges of security holders. Subdivision (4) relates to undue concentration of control of investment companies through pyramiding or inequitable methods of control, the inequitable distribution of control of investment companies, and the management of such companies by irresponsible persons. Subdivision (5) is concerned with unsound accounting methods and inadequate auditing. Subdivision (7) is critical of excessive borrowing or other practices having the effect of unduly increasing the speculative character of junior securities. Subdivision (8) pertains to inadequate assets or reserves of investment companies.

*the consent of their security holders;"* (Emphasis supplied.)

This provision is relevant to our present inquiry because it is here alleged, in effect, that, at the time the stock transaction took place, the service company exercised management functions with respect to Trust Fund. If this is so, then transfer of control of the service company operated to transfer control of the management of Trust Fund. This, according to the above-quoted statutory finding, is contrary to the public interest and the interest of investors, if accomplished without the consent of the investors. Section 1(b) concludes with a declaration that it is the policy and purpose of the act to mitigate and, so far as is feasible, to eliminate the eight enumerated conditions, including that which has been quoted.

The circumstance which is objectionable under this statutory pronouncement is transfer of control without consent, however achieved and whatever the consideration therefor. No language used in this section, or elsewhere in the act, indicates that the price paid for such a transfer of control is a circumstance to be considered.

Section 15(a) (4) of the act gives force and effect to this statutory finding and declaration of policy. It is unlawful, under the latter provision, for a person to serve as an investment adviser except under a written contract which provides, among other things, for automatic termination of the contract in the event of its assignment by the investment adviser. Such a contract may not be renewed except by the vote of a majority of the investors.

Here again, the sanction runs against any assignment, whatever the price paid

and received therefor. An assignment at net asset value is just as fruitless under this section as one for a substantial price in excess of such value. In either case, the contract is automatically terminated. In no respect is the amount paid or received for stock control made a factor to be considered.[12]

Appellant is thus unable to point to any statutory provision which is specifically critical of the price paid for the transfer of control of a service company. It is argued, however, that a price in excess of net asset value renders such a transfer "gross misconduct" or "gross abuse of trusts," if heed is given to historic equitable principles. In this connection, reference is made to Aldred Investment Trust v. Securities and Exchange Commission, 1 Cir., 151 F.2d 254, 261, where it was said that § 36 "invokes the equity power of the Federal court. \* \* \* \*"

Appellant then cites a number of cases which, it is urged, announce equitable principles which are applicable here. The cases relied upon and the principles announced are stated below.

It is a general principle of equity that a personal trustee cannot sell his office. Sugden v. Crossland, 65 Eng. Rep. 620; Forbes v. McDonald, 54 Cal. 98. Nor may this be done by a corporate officer or director. Moulton v. Field, 7 Cir., 179 F. 673; McClure v. Law, 161 N.Y. 78, 55 N.E. 388; Porter v. Healy, 244 Pa. 427, 91 A. 428. A member of a class who assumes to exercise or enforce a class right may not sell it for his own profit. Clarke v. Greenberg, 296 N.Y. 146, 71 N.E.2d 443, 169 A.L.R. 944; Young v. Highbee Co., 324 U.S. 204, 65 S.Ct. 594, 89 L.Ed. 890. Directors of a solvent corporation may not take over for

---

12. Under § 15 of the act, a service contract which had been automatically terminated under paragraph (a) (4) can be reinstated by a vote of the investors. No exception is made in the case of an assignment in connection with which a substantial consideration was received in excess of net asset value. If this is permissible under § 15, it ought not to be

subject to injunctive restraint under § 36. A practice which Congress authorized in one part of the act should not be held to be impliedly prohibited in another. 62 Cases, More or Less Each Containing Six Jars of Jam v. United States, 340 U.S. 593, 599–600, 71 S.Ct. 515, 95 L.Ed. 566.

their own profit an opportunity available to the corporation. Irving Trust Co. v. Deutsch, 2 Cir., 73 F.2d 121. A contract by the board of directors of a corporation to delegate all of its powers to another corporation is unenforceable. Sherman & Ellis v. Indiana Mutual Casualty Co., 7 Cir., 41 F.2d 588.

The assets of a corporation may not be wasted or looted by corporate officers acting in a fiduciary capacity. Moulton v. Field, supra; Bosworth v. Allen, 168 N.Y. 157, 61 N.E. 163, 55 L.R.A. 751; Gerdes v. Reynolds, Sup., 28 N.Y.S.2d 622. The president, director, and dominant stockholder of a corporation may not sell a controlling stock interest in the corporation to outsiders, where the result would be to deprive the corporation of opportunities for gain from controlling distribution to such outsiders. Perlman v. Feldmann, 2 Cir., 219 F.2d 173.

The cited cases exemplify two well-established principles of equity. One of these is that a personal trustee, corporate officer or director, or other person standing in a fiduciary relationship with another, may not sell or transfer such office for personal gain.

In our case, this equitable principle has no application. In saying this, we assume that the appellee-directors, who were the only appellees to receive remuneration from the stock transaction, occupied, with respect to Trust Fund, a fiduciary relationship similar to that involved in the above cases. We also recognize that the result of the stock transactions was to transfer control of the service company to others.

The fiduciary relationship which the service company, including its directors and leading stockholders, occupied with regard to Trust Fund arose by virtue of the service contracts. The shift in the control of the service company did not, and could not, effectuate a transfer or sale of these service contracts. Quite to the contrary, and by operation of § 15(a) (4) of the act, this shift in control automatically terminated the service contracts. This being the case, the price received by appellee-directors for the sale of their stock in the service company cannot be said to represent compensation for the sale or transfer of a fiduciary office involving Trust Fund.

The second principle of equity exemplified in the cited cases is that a person occupying a fiduciary relationship with another will not be permitted to exploit such relationship for personal gain, and in such manner as to deprive the other of assets to which he is entitled.

Appellant takes the position that the facts alleged in the amended complaint show that there was here a violation of that equitable principle. It is argued that the price which appellee-directors received for their stock, in excess of net asset value, represents the capitalized value of the contract between the service company and Trust Fund. This value, according to appellant, is an asset of Trust Fund. It is contended that such asset may not be appropriated by the stockholders of the service company by accepting a profit for the sale of their stock.

It is no doubt realistic to attribute a large part of the value of the service company stock to the contract which it has with Trust Fund. But this value does not represent an asset of Trust Fund. The value which the contract has for Trust Fund lies in the fact that Trust Fund receives investment, administrative, and sales service thereunder. That is all that it paid for, and appellant does not contend that Trust Fund received less.

The value which the contract has for the service company lies in the fact that it receives a profit for rendering such service for the stipulated fees. Trust Fund contracted to pay such fees, and

cannot claim any share in the profits thereunder.[13]

The price of service company stock, over and above net asset value, is based largely upon the expectation that the service contract will be renewed and profits will continue to be received. This prospect no more represents an asset of Trust Fund than do the current profits to the service company, as received. The price received by appellee-directors for their stock in the service company did not come from the coffers of the investment company, but from outside purchasers.[14]

We conclude that the general principles of equity announced in the cases cited by appellant provide no basis for attaching a "gross misconduct" or "gross abuse of trust" label to the transaction described in the amended complaint.

Nor do we find anything of consequence in the legislative history of the act which would support such a conclusion. The pertinent problem with which Congress was asked to deal was not the excess price received for the sale of a controlling interest in the stock of investment advisers.[15] Rather, it was the transfer of control of investment advisers exercising management functions, or their assignment of the service contract to others, without the consent of the investors, regardless of the consideration received therefor. Congress recognized this problem in § 1(b) of the act, and provided a specific remedy in § 15(a) (4).

Section 1(b) (6) of the act, condemning transfers of control or management of an investment company without the consent of their security holders, was originally § 2(6) of S.3580, 76th Cong., 3d Session. In its original form, these additional words appeared at the end of this subdivision: " * * * and without adequate public supervision."

In the final form of this subdivision, the quoted words were deleted. This indicates that Congress believed that the only remedy which was necessary with respect to this particular practice was the provision of § 15(a) (4) for automatic termination. Appellant's brief expresses considerable doubt as to the efficacy of the remedy provided by this section. If this is a well-grounded fear, a legislative and not a judicial problem is presented. See Bruce's Juices v. American Can Co., 330 U.S. 743, 750, 752, 67 S.Ct. 1015, 91 L.Ed. 219.

We hold that the terms "gross misconduct" and "gross abuse of trust," as used in § 36 of the act, were not intended to embrace a transaction of the kind described in the amended complaint.

13. Under the service contract, the service fees are not based on the number of transactions in Trust Fund, or on the amount, kinds, or values of securities bought, sold, or held by Trust Fund. No manipulation of Trust Fund investments can increase the service company's profits. The fees are based solely on what the investors pay in.

14. Appellant has conceded that a stockholder of a service company may make a gift of the controlling stock, subject only to the automatic termination provision of § 15. This could not be true if any value in this stock in excess of net asset value belongs to Trust Fund.

15. Neither the report of the Senate Committee on Banking and Currency on S. 4108 (Report No. 1775, 76th Cong., 3d Session) nor the report of the House Committee on Interstate and Foreign Commerce on H.R. 10065 (Report No. 2639, 76th Cong., 3d Session) comments on any problem in connection with the assignment of service contracts except the lack of prior knowledge or consent of investors. It was pointed out in the SEC Report on Investment Trusts and Investment Companies, Part Three (House Doc. 279, 76th Cong., 1st Session), that various inequitable practices in common use at that time added a value to management contracts far in excess of their ostensible worth. But it was the inequitable practices which constituted the evil to be dealt with. The excess worth was but a symptom of the evil. The practices there criticized are effectively dealt with in many sections of the act. The value which such contracts may have today does not result from these outlawed or regulated practices, but from the normal factors determinative of the selling price of any corporate stock.

It follows that the first cause of action fails to state a claim upon which relief can be granted. It is not necessary to consider the several additional reasons advanced by appellees why the trial court reached the correct result with respect to the first cause of action.

Since the second cause of action is dependent upon a claim being stated in the first cause of action, it too must fail.

Affirmed.