## PACIFIC GAS & ELECTRIC CO. v. SECURITIES & EXCHANGE COMMISSION.

### No. 9918.

Circuit Court of Appeals, Ninth Circuit.

April 14, 1942.

Rehearing Granted June 6, 1942.

■■■■■■■■■■■■■■■

Herman Phleger and Wm. B. Bosley and Robert H. Gerdes, both of San Francisco, Cal., (Brobeck, Phleger & Harrison, of San Francisco, Cal., of counsel), for petitioner.

Chester T. Lane, Gen. Counsel, Securities and Exchange Commission, Christopher M. Jenks, Asst. Gen. Counsel, Lawrence S. Lesser and E. M. Calkin, Attys., all of Washington, D. C. (Arnold R. Ginsburg, Eugene Gressman, and Julian M. Meer, all of Washington, D. C., of counsel), for respondent.

Before GARRECHT, HANEY, and STEPHENS, Circuit Judges.

HANEY, Circuit Judge.

The present cause arises on a petition to review and modify, or set aside an order of the Securities and Exchange Commission.

Pacific Gas and Electric Company, petitioner, hereafter called the company, is a California corporation, and was organized in 1905. On March 23, 1912, the Public Utilities Act of California became effective, St.1911, Ex.Sess., p. 18, and since that date, the company could issue securities only with the approval of the Railroad Commission of California. All its securities now outstanding, have been authorized by the Railroad Commission except 15% of its common stock which was issued prior to March 23, 1912. All the company's public utility properties are located in, and its business is conducted in, the State of California.

The Public Utility Holding Company Act of 1935, 15 U.S.C.A. § 79 et seq., hereafter called the act became effective on August 26, 1935. Section 2(a) (8) of the act defines a "subsidiary company" as meaning:

"(A) any company 10 per centum or more of the outstanding voting securities of which are directly or indirectly owned, controlled, or held with power to vote, by such holding company * * * unless the Commission, as hereinafter provided, by order declares such company not to be a subsidiary company of such holding company; and

"(B) any person the management or policies of which the Commission, after notice and opportunity for hearing, determines to be subject to a controlling influence, directly or indirectly, by such holding company (either alone or pursuant to an arrangement or understanding with one or more other persons) so as to make it necessary or appropriate in the public interest or for the protection of investors or consumers that such person be subject to the obligations, duties, and liabilities imposed in this chapter upon subsidiary companies of holding companies.

"The Commission, upon application, shall by order declare that a company is not a subsidiary company of a specified holding company under clause (A) if the Commission finds that (i) the applicant is not controlled, directly or indirectly, by such holding company (either alone or pursuant to an arrangement or understanding with one or more other persons) either through one or more intermediary persons or by any means or device whatsoever, (ii) the applicant is not an intermediary company through which such control of another company is exercised, and (iii) the management or policies of the applicant are not subject to a controlling influence, directly or indirectly, by such holding company (either alone or pursuant to an arrangement or understanding with one or more other persons) so as to make it necessary or appropriate in the public interest or for the protection of investors or consumers that the applicant be subject to the obligations, duties, and liabilities imposed in this chapter upon subsidiary companies of holding companies. The filing of an application hereunder in good faith shall exempt the applicant from any obligation, duty, or liability imposed in this chapter upon the applicant as a subsidiary company of such specified holding company until the Commission has acted upon such application. Within a reasonable time after the receipt of any application hereunder, the Commission shall enter an order granting, or, after notice and opportunity for hearing, denying or otherwise disposing of, such application."

Section 79f makes it unlawful for a subsidiary company of a registered holding company to issue or sell any of its securities except with the approval of the Commission.

On November 29, 1935, the company filed an application with the Commission for an order declaring that it was not a subsidiary company of the North American Company,

a registered holding company under the act which has held 17.71% of the company's voting stock since June 12, 1930. On September 4, 1940, the Commission directed a hearing upon such application, and on October 10, 1940, directed that such hearing commence, and it did commence, on November 12, 1940. The hearing concluded on January 16, 1941. The trial examiner on April 22, 1941, filed his report recommending that the company's petition be granted.

On July 1, 1941, the California Railroad Commission authorized the company to issue and sell 400,000 shares of its 5% First Preferred Stock, and it commenced to sell them after July 8, 1941.

On September 10, 1941, the Commission entered an order denying the company's application. At that time the company had sold 199,433 shares of the stock above mentioned. On September 18, 1941, the company filed a petition in this court to Review and Modify or Set Aside the order of the commission, and for a stay pending such review. On the same date it filed an affidavit in support of the stay. On the following day, this court made an ex parte order staying and suspending the order and the "operation" thereof, reciting "that by Section 24 of the Public Utility Holding Company Act of 1935 said petitioner is entitled to a review of said order, and that the Court may stay the operation of said order pending review thereof".

On October 17, 1941, the Commission moved to vacate so much of the order of September 19, 1941, as provided for the stay and suspension, on four grounds: (1) the Commission's order is not susceptible of being stayed, because of the act, the company is a subsidiary company, and to stay the order is to have no effect other than to leave the company in the status in which the statute places it, i.e., a subsidiary company; (2) if effective to remove the company from its status as a subsidiary, the stay does not preserve the status quo because when the Commission acted, the company was a subsidiary company under the act, and a stay could not change it; (3) no great or irreparable loss or injury will be suffered by the company, if the stay is vacated, but if not, the national public interest and the interests of investors and consumers may be adversely affected; and (4) this court was without jurisdiction to stay the Commission's order because the jurisdiction to stay is for the purpose of preserving the statu quo, but here, statu quo, i.e., as a subsidiary company, is preserved without the stay.

Upon the hearing of respondent's motion the cause was set for hearing on the merits, and the motion taken under advisement. In view of our decision on the merits, the motion has become moot.

The Commission held that the Trial Examiner had reached his recommendation because he had misconstrued the statute. The Commission construed § 2(a) (8) of the act as meaning (1) that the applicant had the burden of proving that its management and policies are not subject to the controlling influence of North American; and (2) that "controlling influence" meant something less in the form of influence on the management or policies of a company than "control" of such company, that "control" includes the power to control, and "subject to a controlling influence" includes susceptibility to domination. It found that petitioner "has not demonstrated that its management and policies are not subject to the controlling influence of North American * * *" The two rules of law mentioned above and the finding are challenged here.

As to the finding, petitioner contends, as the Board found "that the record does not reveal any past attempts by North American to interfere affirmatively with the management or policies of P. G. & E." If petitioner's contention regarding the second rule of law above mentioned is correct, then reversal follows. However, if the Commission's view on the second rule of law is correct, then the question arises as to whether there is any substantial evidence to support the finding.

Section 2(a) (8) of the act provides that the Commission shall declare that an applicant is not a subsidiary company, if it finds three facts: (1) that the applicant is not controlled directly or indirectly by a holding company; (2) that the applicant is not the medium of control of another company by a holding company; and (3) that "the management or policies of the applicant are not subject to a controlling influence, directly or indirectly, by such holding company * * * so as to make it necessary or appropriate in the public interest or for the protection of investors or consumers that the appli-

cant be subject to the obligations, duties, and liabilities imposed in this chapter upon subsidiary companies of holding companies." Since the statute requires findings of all three facts, in order to exempt a subsidiary as such, and since the third fact was not found by the Commission, the company is not entitled to exemption if the Commission's action regarding the third fact is sustained here.

■ The company contends that the language of the statute describing the third fact means "actual and existing control", rather than "susceptibility to control" as the Commission held, and since the Commission found that the evidence affirmatively showed a lack of actual and existing control, an exemption order should have been granted. The company quotes a portion of a committee report, and a part of Senator Wheeler's argument in the debates on the act. While the report sheds no light on the present question, the portion of the argument mentioned definitely supports the company's view. We think such argument must be disregarded because contrary to the plain meaning of the act. Pennsylvania R. R. Co. v. International Coal Co., 230 U.S. 184, 198, 199, 33 S.Ct. 893, 57 L.Ed. 1446. If the company's argument were adopted, then the first and third facts enumerated in the statute would be identical, and the third would therefore be surplusage. In view of the rule, that a legislative body is presumed to have used no superfluous words in a statute (Platt v. Union Pac. R. Co., 99 U.S. 48, 58, 25 L.Ed. 424), and the rule that "effect shall be given to every clause and part of a statute" (Ginsberg & Sons v. Popkin, 285 U.S. 204, 208, 52 S.Ct. 322, 323, 76 L.Ed. 704) we think the construction of the statute by the Commission which gives effect to the entire statute is correct and must be sustained.

We are thus brought to the questions regarding the findings and the evidence. The Commission found that the company had not "demonstrated" a lack of susceptibility to control by North American. The company argues that the Commission thus saddled it with a burden of proof to a clear and convincing degree. The Commission argues that the company has the burden of proving the lack of susceptibility to control. Dispute between the parties exists with respect to the question as to whether the statute creates a rebuttable presumption that the company is a "subsidiary company" or whether the company is "prima facie" such a subsidiary.

■ ■ The words "burden of proof" are used in two senses: (1) the duty to prove a charge by a degree of proof such as a preponderance of the evidence; and (2) the duty to go forward with the evidence. Department of Water and Power v. Anderson, 9 Cir., 95 F.2d 577, 582, 583. In the first sense, "burden of proof" has no application to an administrative proceeding such as this. The statute does not specify any degree of proof required for any particular finding. The statute in question permits an application to be *granted* without hearing, but requires "notice and opportunity for hearing" if the application is *denied* or *otherwise disposed of*.

The statute does not even specify the party who shall have the duty of opening and closing the hearing. If such a hearing is held it is only common-sense which requires the company to present its evidence, since it seeks a particular declaration. When the evidence is all in, the Commission considers the whole body of evidence, both pro and con, and finds what the ultimate facts are, unrestrained by any rule regarding burden of proof, as used in the first sense. The sole restraining rule is that the fact found must be supported by substantial evidence, as is provided in § 24(a) of the act, and if such fact is so supported, it is conclusive, whether it is supported by what someone other than the Commission thinks is a *preponderance* of the evidence or not.

■ Since the company is, by the terms of the act, a "subsidiary" company and can be relieved of that status only by an order of the Commission, and since such an order may be made only when the Commission finds three facts, in a broad sense, it is natural to say that the company has the "burden of proof". However, when those words are used, neither of the technical senses, mentioned above, is intended. What is meant is that the company must present substantial evidence which convinces the Commission as to the three facts mentioned. We do not understand that anything different was meant in Securities and Exchange Comm. v. Sunbeam Gold M. Co., 9 Cir., 95 F.2d 699, 702 and Detroit Edison Co. v. Securities & Exchange Commission, 6 Cir., 119 F.2d 730, 739.

The company contends that the finding of the Commission that the company "has

not demonstrated that its management and policies are not subject to the controlling influence of North American" is not sustained by substantial evidence. The Commission relied on facts and made inferences to support its finding, as follows:

(a) North American owns 17.71% of the voting stock in petitioner. The second largest stockholder holds 1.72% of the voting stock. The rest of the stock is owned by corporations and individuals, scattered widely. Of the total voting stock 47.9% is held by non-residents. The Commission said:

"* * * It is apparent that if a vital and substantial conflict arose between applicant and North American and matters came to the point of a proxy fight, the holdings of North American represent a tremendous advantage in any such fight. Counsel have argued as to the possible outcome of such a proxy fight. We need not speculate here as to whether North American's 17.71% of voting power, plus the votes it could attract would be offset by the voting power which the local management could attract. It cannot be denied that, in any event, North American's holdings would make it a formidable opponent. And the mere fact that there is a strong possibility that North American could prevail would, in itself, be a potent tool in influencing the management to give heed to North American's wishes."

(b) North American's holdings have represented from 25% to 30% of the total votes cast at stockholders' meetings from 1931-1940. The Board said:

"* * * First, so long as North American is satisfied with the present management, North American's voting power and the proxy machinery in the hands of the management make it virtually impossible for any other interest or group of interests to elect a majority of the directors. Second, North American's votes have represented 25 to 30% of the votes cast at stockholders' meetings, and by virtue of its stockholdings, North American had the power to break a quorum at all but two stockholders' meetings since it became applicant's largest stockholder; if it had chosen to do so, no business could have been transacted at such meetings. Third, the ownership of virtually ⅓ of applicant's common stock gives North American an effective veto power over any corporate action requiring the consent of ⅔ of each class of stock—e.g., mergers and consolidations."

(c) Petitioner was organized in 1905 and now represents the consolidation of over 400 separate companies. It formerly purchased power from Great Western Power Company, which was organized in 1906. During most of the latter's existence, 90% of its revenues came from territory in competition with petitioner. Several unsuccessful attempts were made by petitioner to acquire the properties of Great Western between 1911 and 1925. Petitioner's present president is one Black, formerly an employee of Great Western. North American acquired control of Great Western in 1925, and in 1927, Black went to New York as vice president of North American—his principal duties at that time being to keep in touch with and assist Great Western and its subsidiaries.

In 1930, following negotiations begun in the previous year between Black and petitioner's then president, resulted in the acquisition by petitioner of the securities held by North American in Great Western and its subsidiaries. It was orally agreed that North American would not interfere with petitioner's management, that North American would be entitled to three members on petitioner's board of directors and one member on its executive committee. Black became a member of petitioner's board of directors as North American's representative.

Regarding these facts, the Commission said:

"It is wholly untrue to characterize North American's relationship to P. G. & E. as merely that of a stockholder holding an investment interest. It now has two of its representatives on P. G. & E.'s board of directors, and by cumulating its votes it could elect at least three directors. Moreover, under the agreement made at the time of the Western Power Deal, it could at any time have a representative elected to applicant's executive committee. Against the background of the other facts we have discussed, the fact that North American has been given the 'right' to such representation on applicant's board of directors and executive committee is, we think, of material significance. We find some significance, too, in the frequent and detailed reports of every phase of applicant's operations sent by applicant to

North American; no such reports are sent to any other stockholder."

(d) Regarding the facts mentioned under (c), the Commission said:

"Nor can we disregard the fact that applicant's most important executive officer, Black, its president, was, for eight years just prior to his appointment, a senior executive of North American. From February 1927 to June 1930 Black's primary duty as vice president of North American was to exercise holding company supervision over the activities of the subsidiaries of Western Power Corporation. He conducted the negotiations for North American in which Western Power was transferred to P. G. & E. and as a result of which North American acquired its interest in P. G. & E. For five years, from 1930 to 1935, Black was the individual in the North American organization who, more than any other one person, kept advised as to applicant's business and followed applicant's affairs in the light of North American's interest. It is also significant that since Black became president of P. G. & E., no effort has been made to North American to have representation in the executive committee, and no one in North American's management has followed applicant's affairs as closely as he did. It is wholly unreal to suppose that Black would be uninfluenced by these circumstances and, in his dealings with North American, would treat it as merely a large stockholder of P. G. & E."

■ The facts, as thus stated, are not disputed. It is contended that the inferences drawn are contrary to the evidence. Such evidence was, of necessity, opinion evidence, because the facts inferred by the Commission were events which *might* happen, not what actually happened. In other words, the evidence relied on consisted of predictions that specified events *would not* occur, and did not consist of facts that such events *could not* happen. Manifestly, the Commission was not bound to accept the predictions as facts. As said in National Labor Relations Board v. Link-Belt Co., 311 U.S. 584, 597, 61 S.Ct. 358, 365, 85 L.Ed. 368: "Congress entrusted the Board, not the courts, with the power to draw inferences from the facts. * * * The Board, like other expert agencies dealing with specialized fields * * * has the function of appraising conflicting and circumstantial evidence, and the weight and credibility of testimony". The rules quoted are applicable here.

■ Regarding the inferences made, the only question which we may consider is one of law, that is, were the inferences made reasonable? We think a reasonable man could reach the conclusion the Commission reached, and therefore the finding must be sustained.

■ ■ The company also contends that the Commission did not consider other evidence which tended to show that North American had not attempted to dominate the company in the past. However, as quoted above, the Commission found specifically in accordance with such evidence. In view of what we regard as the proper construction of the words in the statute, "subject to a controlling influence", a finding for the company is not compelled by the fact that North American had not dominated the company in the past. Congress may prevent an evil from occurring, and need not wait till the damage is done before acting. Compare: Consolidated Edison Co. v. National Labor Relations Board, 305 U.S. 197, 222, 59 S.Ct. 206, 83 L.Ed. 126. We think the construction of the statute approved here, carries out what we think Congress regarded as a preventive measure.

After finding that petitioner had failed to sustain its burden of showing that it was not subject to the controlling influence of North American, the Commission held that it was necessary or appropriate in the public interest or for the protection of investors or consumers, for petitioner to be subject to the act. It stated in this connection that petitioner "is a company with stated assets of almost $800,000,000 serving in excess of 1,500,000 customers; its securities are listed and traded on national security exchanges and are owned by investors throughout the country". This finding arises by reason of § 2 (a) (8) of the act quoted above.

■ It is obvious that what is "necessary or appropriate in the public interest" is a question for the Commission to decide. Section 1(b) of the act enumerates a number of evils existing between holding companies and their subsidiaries. Section 1(c) provides in part: " * * * it is hereby declared to be the policy of this title [chapter], in accordance with which policy all the provisions of this title [chapter] shall be interpreted, to meet the problems and

eliminate the evils as enumerated in this section * * *."

The company contends that this quoted provision is the standard by which the Commission is to be guided in determining what is "necessary or appropriate in the public interest" and that there is no showing of the existence of present evils, or of "such a controlling influence as would enable the holding company to bring about the evils enumerated in the Act".

 We think it is unnecessary to decide this question, because of the construction of § 2(a) (8). The words "so as to make it necessary or appropriate in the public interest or for the protection of investors or consumers that the applicant be subject to the obligations, duties, and liabilities imposed in this title [chapter] upon subsidiary companies of holding companies", which we will refer to as the necessity clause, are such that the meaning of the entire sentence is not clear. We think there are three possible constructions of the entire sentence.

The narrowest construction of the sentence arises when the necessity clause is construed as modifying all three of the conditions mentioned in (i), (ii) and (iii), that is, e.g., that the control mentioned in (i) must be of a kind which makes it necessary or appropriate for the applicant to be held to be subject to the act. The Commission in Matter of Wisconsin Valley Improvement Company, —— S.E.C. ——, found that the applicant was subject to the controlling influence of holding companies, but that because of "the character of applicant's business and the nature and extent of statutory and state commission regulation" it was not necessary or appropriate to make the act applicable to the applicant. That decision cannot be said to be unreasonable. It seems as reasonable to say that there might be actual control under (i) and yet the same factors would prevent the control from being exercised.

A second, and more liberal construction, insofar as it gives the Commission broader powers, arises when the necessity clause is considered as modifying only the condition mentioned in (iii). In other words, if there is control, specified in (i) or applicant is the intermediary through which such control is exercised, then the application should be denied, regardless of whether such control makes it necessary or appropriate that the applicant be held

to be subject to the act, and that it is only when the applicant is subject to a controlling influence, that there must be necessity or appropriateness in the public interest for applicant to be subject to the act. Considered superficially from the standpoint of sentence structure the second construction seems to be correct. However, even though there is no control under (i) it may be that such control cannot be exercised, or the control may be regarding a thing which could not possibly harm anyone. In either event, it seems illogical to say that the necessity clause modifies the controlling influence under (iii) but not the control under (i).

A third construction, and the one which gives to the Commission the broadest powers, arises when the necessity clause is not considered as a modifying clause at all, but as a fourth condition. As thus construed, before the application could be granted it would be necessary for the Commission to find that there was no control under (i), that applicant was not an intermediary through which such control might be exercised under (ii), that applicant was not subject to a controlling influence under (iii), and that it was not necessary or appropriate in the public interest to make the act applicable to applicant. If the contrary of any of the four conditions thus enumerated were found by the Commission, then the application would have to be denied. In other words, if the Commission found control under (i), or that applicant was the medium of control under (ii), or that applicant was subject to a controlling influence under (iii), the application would have to be denied regardless of whether there was necessity or appropriateness under the necessity clause; on the other hand, if the Commission found that none of those three conditions were present, it could still deny the application on the ground that there was a necessity or appropriateness that the act be held to be applicable to applicant under the necessity clause.

We believe the latter construction is correct. Congress thought that the ownership by one corporation of 10% or more of the voting securities of another sufficient to declare the latter corporation to be a subsidiary, regardless of any other factor. It became a subsidiary not because of "control", or because it was the medium of control, or because it was subject to a "controlling influence", but because of the ownership of at least 10% of its stock.

Congress recognized that harm might result to the public when there was such ownership, regardless of whether any of the three factors were present. It did not make as a condition to regulation any of these three factors. It is unreasonable to say that Congress intended to exempt from regulation when those three conditions only were not present. It seems apparent that harm might result to the public when none of such factors was present—that is the harm might spring from other factors. Such factors would be covered by the fourth condition, because of its generality.

This view is not contrary to the result of the Commission's holding above mentioned. It is inconsistent to say that A is subject to the controlling influence of B, when B is prevented from exercising it. In such event, A is not subject to a controlling influence because B cannot in fact exercise it.

The remaining portion of § 2(a) (8) of the act speaks of the "conditions specified in clauses (i), (ii), and (iii)". It does not say that there are only three conditions, but makes it clear that the conditions referred to are those "regarding the affiliations or intercorporate relationships". The fourth condition relates to the conditions between the subsidiary and the public.

As thus construed, the application was properly denied regardless of whether the finding under the necessity clause was sustained by substantial evidence or not. ▮ The company suggests that some constitutional questions are involved, but it does not appear that such questions were presented to the Commission, and therefore we cannot consider them. See § 24(a).

The petition to review is denied.

GARRECHT, Circuit Judge (dissenting).

It appears that North American Company (hereinafter called "North American") owns, controls, and holds with power to vote 17.71% of petitioner's outstanding voting securities. Therefore, by statutory definition petitioner is a subsidiary of North American. Following the provisions set forth in the Act, Pacific Gas and Electric Company sought by appropriate petition to bring itself within the exemption provided in the Act by alleging and offering to establish that (1) it is not controlled, directly or indirectly, by North American; (2) it is not an intermediary company through which control of another company is exercised; and (3) its management or policies are not subject to such a controlling influence, directly or indirectly, by North American, so as to make it necessary or appropriate in the public interest or for the protection of investors or consumers, that it be subject to obligations, duties, and liabilities imposed in the Act upon subsidiary companies.

The Commission issued notice of, and ordered, a hearing on petitioner's application. The hearing was had before a trial examiner. Although there was no real dispute as to the facts as set forth in the trial examiner's report, both counsel for petitioner and counsel for the Commission filed with the trial examiner separate requests for specific findings.

The report and findings of fact made by the trial examiner found and concluded that petitioner was entitled to the order which it sought. Thereupon counsel for the Commission filed exceptions to the report, and the matter was presented to the Commission upon brief and oral argument, and thereafter the Commission made findings, rendered an opinion, and entered its order denying petitioner's application.

Although by the terms of the statute Pacific Gas and Electric Company is an affiliate of North American, because it does hold more than ten percent of petitioner's stock, nevertheless if the evidence shows that it is not controlled and that its management and policies are not subject to a controlling influence, directly or indirectly, by such holding company, it is entitled to an order of the Commission declaring the company not to be a subsidiary.

While the Commission concedes that the evidence shows that there is no control of petitioner by North American, the Commission maintains that it may still deny petitioner's application upon the assumption or supposition that merely ownership of 17.71% of the stock of petitioner by North American renders it subject to the controlling influence of such holding company despite the facts that there never has been any exercise of control or any effort in that direction and in the face of the evidence of the officers of North American that it holds the stock as an investment only and that there is no intention to exercise any control over petitioner and the further evidence of the officers and management of petitioner that

they would not permit such control. It is also an admitted fact that petitioner's utility properties are all located, and its business is conducted, in the state of California. In this regard the Commission said: "On the basis of the record before us, we find that applicant and all of its subsidiary companies are predominantly intrastate in character and carry on their business in California, the State in which each of them is organized, and that applicant is predominantly a public utility company whose operations as such do not extend beyond the State of California. * * *"

Petitioner is subject to the public utilities act of said state and can issue securities only with the approval of the California Railroad Commission. This state commission by its representatives appeared at the hearing and presented a statement, which was received by the Commission, showing the manner and extent of its regulation of appellant, and in this document the California Railroad Commission stated that it was "aware of no instance during the course of this Commission's regulation of Pacific Gas and Electric Company when its management or policies appear to have been either controlled or influenced by North American Company".

### The Question of Control.

Referring to the question of control as indicated by stock ownership, the court in Electric Bond & Share Co. v. Securities and Exch. Comm., 2 Cir., 92 F.2d 580, 592, said:

"* * * Congress elected the element of stock ownership, a factor most usually indicative of control, as prima facie evidence of control. The burden of proof, which is cast upon the utility company to prove otherwise, is not onerous. Judicial review is provided to guard against any arbitrary action on the part of the Commission and to afford a remedy should the Commission's finding be not supported by substantial evidence. * * *"

That case was subsequently appealed to the Supreme Court of the United States under the same title, 303 U.S. 419, 58 S.Ct. 678, 82 L.Ed. 936; 115 A.L.R. 105. In the latter case the Department of Justice, for the Securities and Exchange Commission, filed an able and carefully prepared brief, discussing various sections of the Act. Upon the subject of stock control, because of the clearness of the reason-ing and aptness of application to the present discussion we quote from that brief the following (Br. for Resp., p. 6 of Apx. A):

"A holding company, by express definition * * * is a company which *actually controls* operating companies, and not a company which merely has an investment in operating companies. Conversely, a subsidiary company, by express definition * * * is a company *actually controlled* by the holding company, and not simply a company in which the holding company has a substantial interest. Ten percent voting stock ownership creates a presumption of control in order to facilitate administration of the Act and to prevent ready evasion. That presumption, however, can readily be rebutted by either the putative holding company or the putative subsidiary company (Section 2(a) (7) and (8)) upon a showing that the company does not in fact exercise control. * * * No true investment company—i. e., a company which does not control the operating companies in which it invests—is in any manner affected by the act."

The following quotation is also from that brief (Br. for Resp., pp. 197–198): "* * * a company may readily prove if such be the fact that it does not possess control. Such burden of proof is not onerous because every company has completely within its own organization full knowledge and control of all the facts and evidence * * *. Judicial review is provided to guard against any arbitrary action on the part of the Commission, and to afford a remedy should the Commission's findings of fact be not supported by substantial evidence (Section 24(a)). * * *"

With these declarations of the court and from the Commission in mind let us have a look at the testimony as found in the record and which was not contradicted.

The present board of directors consists of five directors who are officers and full-time employees of petitioner, eight directors who are prominent San Francisco business men, and two directors, Fogarty and Freeman, who are admittedly representatives of North American. Neither of these two North American representatives is a member of the executive committee.

All directors and principal officers, with the exception of the two directors who are officers of North American, are residents of San Francisco and vicinity; were either

388

born in California or came to California early in life and have resided in California since that time; are prominently identified with California enterprises, and have no substantial interest in any eastern business or any corporation whose business is not principally conducted in California. During the entire period of petitioner's existence the members of the board of directors, with few exceptions, have been residents of San Francisco and vicinity, and have and do own and represent substantial stock interests in petitioner, and the fathers of four directors (directors C. O. G. Miller, Norman B. Livermore, A. E. Wishon, and W. W. Crocker) were active in the affairs of predecessor companies. All of the directors, with the exception of directors Fogarty and Freeman, know each other well, some are associated together in other enterprises, and several have known each other from boyhood.

The directors, other than those who are active executives of the Company, and excepting directors Fogarty and Freeman, are prominent in other business affairs in San Francisco and vicinity; two are chairmen of the boards of local banks, one is president of a third bank; all are directors of numerous corporations, including other utilities and several are officers or trustees of educational or charitable institutions.

Each of petitioner's local directors to whom the question was propounded, namely, Messrs. Miller, McKee, Crocker, Chickering, Livermore, Coghlan, Palmer, Nichols, McIntosh, Wishon, and Black, testified that it was his opinion that North American could not, if it attempted to do so and its attempts were resisted by the local directors, secure sufficient proxies to obtain a majority of the stock represented at a stockholders' meeting.

Mr. Black testified that he would oppose any attempt by North American to control or influence the management or policies of the petitioner with "every resource at my command" and that he was sure they would not be successful in a proxy fight because—

"This company has a rather unique position in San Francisco and in California. It has been known for many years as a California company. The fact that the Great Western Power Company was controlled by an eastern company, the Western Power Corporation, was a great handicap to the Great Western Power Company in doing business here and particularly in competition with the Pacific Gas and Electric Company. I know something of that feeling. I think 48 percent of our stock is held here in California and I think without question that stock would be almost unanimously opposed against any attempt by any eastern interest, particularly any New York holding company, to get control of the company.

"Our directors are men not only who are men who own, or are able to influence very large blocks of stock directly, but they have a standing in the community and in the business world which I think would be very decisive in getting large amounts of stock proxies from holders outside of the State. I am sure that the community as a whole would be entirely on the side of the company in any such fight."

Director Fogarty, the representative of North American on the board, testified that the management or policies of petitioner were neither directly nor indirectly subject to a controlling influence by North American. Nor had that company ever attempted to influence or control the management. He also said that as a practical matter it would not be possible. Mr. Freeman, the other representative, corroborated this view. Mr. Fogarty never attended a directors' meeting. This is also true of Mr. Freeman, who has never been in California.

The testimony of all of these witnesses is not contradicted.

It is probably worth remarking in this connection that North American has never solicited proxies; in fact, its officers or representatives have never voted its own stock, its proxies having been sent to other stockholders. If there existed any apprehension that North American might seek proxy control, the Commission has the power to prevent North American from soliciting any proxy.

To reach the conclusion arrived at by the Commission every circumstance is viewed with a hostile eye and every instance tortured into some semblance of sinister purpose. Thus, the selection of James B. Black as president of appellant upon the unexpected death of Mr. Hockenbeamer, who had been president for many years, is pointed to as unmistakable proof of the evil influence exerted by North American, because at the time of Black's appointment he was the vice-president of North American.

It must be admitted that Black probably was as well qualified for the position as anyone anywhere; his career is altogether a notable one. His personal, professional, and administrative achievements are detailed at some length in the record, from which we summarize briefly: He came with his parents to California at the age of twelve and has lived in San Francisco and vicinity ever since, with the exception of the short period when he resided in New York and served as vice-president of North American. He was educated in the schools of Oakland and San Francisco and at the University of California, from which he graduated in 1912 in engineering. After graduation he was employed as a service inspector by City Electric Company, then a subsidiary of Great Western operating in San Francisco. About 1915, the properties of City Electric Company were taken over by Great Western, and Mr. Black successively engaged in sales, sales engineering, and administrative work in its San Francisco division. Later he became divison manager, assistant general agent and general sales manager, and acting general manager, and in 1922 was made vice-president, general manager and a director of that company. After North American acquired control of Western Power Corporation, Mr. Black retained these positions until February, 1927, when he went to New York at the invitation of North American as one of its vice-presidents.

His selection as president of Pacific Gas and Electric Company was entirely the result of the action of the California directors of that company, many of whom were acquainted with Black's capabilities. The fact that he was a Californian, that he was familiar with some of the properties of the company, and had wide experience were deemed qualifications, and his selection met with the unanimous approval of the board of directors. No suggestion of Mr. Black's election was made by anyone in North American; his selection was not anticipated by the officers of that company, to whom it was a surprise. There is no evidence in the record indicating that North American played any part in the choice of Black as president of petitioner, other than to consent when the California directors asked permission to offer the position to him. When Black accepted the position he assured the California directors that he would sever all connections with North American. He has never sought or received the advice, approval, or recommendations of North American or its officers on any dividend rate, salary, refinancing, or any other pending matter. There is no difference between the information received by North American nor in the other relations with petitioner since Black became president than existing before that time.

Not only did the Commission disregard the uncontradicted evidence substantiating that there was no "control" or "controlling influence", it also disregarded a specific and important instance revealed by the evidence which very persuasively negatived such control. At one of the meetings of the board of directors of Pacific Gas and Electric, at which the question of declaring a dividend was up for consideration, it was voted that the dividend for that year be declared at the rate of six percent instead of the usual eight percent. The representatives of North American requested the board to reconsider this action, but it did not accede to the request.

Notwithstanding the uncontroverted evidence to the contrary, the Commission went off into the realm of speculation as to what might happen if North American should undertake to engage in a proxy fight with appellant's existing management for control, and it determined that the mere fact that there might be a strong possibility (based likewise on conjecture) that North American could prevail was itself proof of "susceptibility" to a controlling influence.

This opinion is much too long but we must at least mention that there are other instances where the Commission very frankly has interpreted the testimony of the witnesses contrary to their evidence. These interpretations, which are exaggerated into some semblance of an argument, are then designated as inferences of the Commission as to "events which might happen" but "not what actually happened". The majority opinion in approving these methods of the Commission quotes an excerpt from National Labor Relations Board v. Link-Belt Co., 311 U.S. 584, 597, 61 S.Ct. 358, 365, 85 L.Ed. 368, as follows: "Congress entrusted the Board, not the courts, with the power to draw inferences from the facts. * * * The Board, like other expert agencies dealing with specialized fields * * * has the function of appraising conflicting and circumstantial evidence, and the weight and credibility of testimony". But here there

is no conflicting evidence to appraise, and as to weight and credibility of testimony it must be noted that the witnesses who testified contrary to the findings were outstanding men of affairs in California, and they were not contradicted or impeached, and no reason appears in the record why they should be discredited.

According to the Commission petitioner was required to "demonstrate" non-control or influence by North American. The Act does not require any such mathematical extreme which excludes possibility of error. 23 C.J. 9. It is sufficient if such showing is supported by substantial competent evidence which is not contradicted. Due process requires that the competent evidence adduced be fairly considered by the Commission on its merits. As was said by Justice Brandeis in speaking for the court in the Chicago Junction Case, 264 U.S. 258, 265, 44 S.Ct. 317, 319, 68 L.Ed. 667, "The provision for a hearing implies both the privilege of introducing evidence and the duty of deciding in accordance with it. To refuse to consider evidence introduced or to make an essential finding without supporting evidence is arbitrary action." In Morgan v. United States, 298 U.S. 468, 480, 56 S.Ct. 906, 911, 80 L.Ed. 1288, Chief Justice Hughes said:

" * * * The requirement of a 'full hearing' has obvious reference to the tradition of judicial proceedings in which evidence is received and weighed by the trier of the facts. The 'hearing' is designed to afford the safeguard that the one who decides shall be bound in good conscience to consider the evidence, to be guided by that alone, and to reach his conclusion uninfluenced by extraneous considerations which in other fields might have play in determining purely executive action. * * *"

Moreover, this court is not called upon to determine the credibility of witnesses or to reach a conclusion upon substantially conflicting facts. Indeed, no such question is presented here, since the Commission has said in its opinion that—

"There is almost no dispute as to the facts in this case as they are set forth in the trial examiner's report and in the briefs of both counsel. The point of issue with respect to the application under Section 2 (a) (8) is rather one of statutory interpretation and in this respect we cannot agree with the conclusions reached by the trial examiner", who found that Pacific Gas is not in fact controlled by, or subject to the controlling influence of, North American.

The Commission principally relies upon the case of Detroit Edison Co. v. Securities & Exch. Com., 6 Cir., 119 F.2d 730. It is submitted that the facts in that case are so different from the one before us that it cannot be considered an authority to support the action of the Commission here. In the Detroit Edison case, by agreement with two existing companies, a syndicate organized by North American acquired their stock and organized the Detroit Edison Company. Its officers and directors were all designated by North American. On behalf of its syndicate North American then offered all of the stock of the corporation and agreed to finance and furnish other assistance to the new company on certain terms. By the deal the syndicate acquired three million dollars of Edison's first mortgage bonds and fifty thousand shares of its stock. The Edison then began operations. Thereupon the syndicate was dissolved, and North American retained more than 10 percent of petitioner's outstanding voting securities. The record shows that North American dominated the board of directors through the years, and at the time of the hearing a majority of the directors still had affiliations with North American. There were other intercompany relationships too extended to detail here, but which are referred to in the opinion and which had been discontinued not long before the hearing. From these facts it was concluded that in the light of Edison's origin and the unbroken continuity of North American's officers, directors, and designees on its board, and its absolute domination for many years by the parent company, it was not entitled to an order granting exemption from the statute. In summing up the situation the court said:

"The fact that the North American Company had abandoned some of the characteristics of 'controlling influence' over the petitioner at the time of the hearing, did not require the Commission to disregard prior interrelated activities. There is no showing that its latent power to resume such control has been extinguished. The relationship is such that they may enter into similar activities in the immediate future. * * *

"Giving due weight to the past transactions of petitioner with the North Ameri-

can and the continuing opportunity for the resumption of such activities and the extent of the petitioner's business and the widely scattered ownership of its stock, the Commission committed no error in denying petitioner exemption from the present Act." 119 F.2d at pages 739; 740.

All the evidence in the case before us shows a complete absence of such relationships and of any control throughout the period since North American became an owner of certain stock of Pacific Gas and Electric Company because of the transfer to it of certain utility properties that it had theretofore owned.

The Commission admits that the record does not reveal any past attempt by North American to interfere with its management or policies. It is likewise conceded that there is no evidence of actual control, nor, as has been shown, is there any substantial evidence from which any legally sound inference can be drawn that there ever was any effort whatsoever by North American to subject appellant to any controlling influence. Nor is there any testimony in the record from which any fair inference can be drawn that petitioner was subject to the controlling influence of North American.

From the discussion in Congress at the time the Act was under consideration and as well from the fair and ordinary meaning of the language, the phrase "subject to a controlling influence" does not mean, as the Commission found and the majority opinion determined, that appellant was required to "demonstrate" that its management and policies were not "susceptible to control" by North American. "Subject to a controlling influence" is not the equivalent of *"susceptible* to a controlling influence". "Susceptible" and "subject" are not interchangeable or synonymous terms. The word "susceptible" connotes an especial liability to mental or emotional impressions. Advisedly that expression was not used in the statute. But the word "subject" is used, and here it occurs in relation with "control", and in that sense it can be correctly defined as meaning "under rule, authority, or domination". Thus, "subject to a controlling influence", as stated in the statute, is not the same thing as "susceptibility" to a controlling influence as expressed by the Commission. One phrase refers to an actually existing state; the other might be applied to express some future condition which uncertain

events might possibly bring about. In considering this aspect of the matter it is important to keep in mind that under the statute the Commission is in a position to act at once if ever the susceptibility should become an actuality, even if the Commission had theretofore granted petitioner an exemption at a time when the facts showed a lack of any actual and existing control or controlling influence.

It is also clear that the vague, artificial tests here employed are not sanctioned by the Act. Nor was it expected that inferences based upon inferences, or suppositions, or even possibilities, would be substituted for substantial evidence.

The facts presented to the Commission and all reasonable inferences, deductions, and conclusions to be drawn therefrom, considered in their entirety and in relation to one another, negative the findings of the Commission. The inferences which are suggested as supporting the order of the Commission are based on mere suspicion. In National Labor Relations Board v. Columbian Co., 306 U.S. 292, 299, 300, 59 S.Ct. 501, 505, 83 L.Ed. 660, Mr. Justice Stone said:

"* * * But as has often been pointed out, this, as in the case of other findings by administrative bodies, means evidence which is substantial, that is, affording a substantial basis of fact from which the fact in issue can be reasonably inferred. * * * Substantial evidence is more than a scintilla, and must do more than create a suspicion of the existence of the fact to be established. 'It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion,' * * *."

In vesting the Commission with the duty of ascertaining "control" or "subject to a controlling influence" of one company by another Congress did not imply that a potential facility to exercise control was sufficient to establish such controlling influence. If this alone were sufficient the Congress would not have made provision for the exemption.

The legislative history of the Act corroborates this view. In the course of the debate on the bill, Senator Wheeler, chairman of the Committee in charge, said, with reference to the 10% clause (79 Cong. Rec., p. 8397): "That is only prima facie evidence; but even if they hold 40 percent of the stock of a company they may come before the Commission and produce evi-

392

dence that they are not actually in control of the company, and the Commission is directed to make a finding and to exempt them if they are not actually controlling the company as the word 'control' is defined in the bill."

Again, Senator Wheeler said (79 Cong. Rec., p. 8439) : "No, Mr. President. Let me make a distinction. The Senator from Delaware said: 'Suppose I own 10 percent of the stock of some company.' Unless I control that company I am not a holding company under the terms of this bill. The mere ownership of the 10 percent of the stock does not of itself make him a holding company, because unless he actually controls the company he is not a holding company. The Senator may overlook the factor of control. He may show that he actually does not control the company in which he owns 10 percent of stock, and if he does not have control he is not a holding company."

While the majority opinion concedes that this discussion in Congress definitely supports the position of appellant, that view is discarded because it is said that if followed, some language of the Act would appear to be surplusage. Neither the Commission nor the Court is warranted in departing from the purposes expressed because of any doubts that may exist as to the wisdom of following the course which Congress has marked out.

The evidence in the record so clearly sustains the position of petitioner that the majority opinion, in its final analysis, appears to have deemed it necessary to expand the statute beyond its terms. As if to relieve itself from some haunting conviction that the findings have no basis in substantial evidence, the Court proceeds to elaborate a new pronouncement, whereby the Commission can be sustained even admitting that there is no substantial evidence or not any evidence at all.

According to the contention of all the parties, but three conditions must be met to entitle a petitioner to an order of exemption, to wit: (1) that the applicant is not controlled directly or indirectly by a subsidiary company; (2) that the appli-

cant is not the medium of control of another company by a holding company; and (3) that "the management or policies of the applicant are not subject to a controlling influence, directly or indirectly, by such holding company * * * so as to make it necessary or appropriate in the public interest or for the protection of investors or consumers that the applicant be subject to the obligations, duties, and liabilities imposed in this chapter upon subsidiary companies of holding companies".

The majority opinion, however, after having quoted the above language goes on to say that there is an additional construction, and "one which gives to the Commission the broadest powers", which "arises when the necessity clause is not considered as a modifying clause at all, but as a fourth condition. * * * if the Commission found that none of those three conditions were present, it could still deny the application on the ground that there was a necessity or appropriateness that the act be held to be applicable to the applicant under the necessity clause. We believe the latter construction is correct. * * *" And in conclusion the opinion recites:

" * * * It is unreasonable to say that Congress intended to exempt from regulation when those three conditions only were not present. It seems apparent that harm might result to the public when none of such factors was present—that is the harm might spring from other factors. Such factors would be covered by the fourth condition, because of its generality.

* * * * *

"As thus construed, the application was properly denied regardless of whether the finding under the necessity clause was sustained by substantial evidence or not."

It seems to me that the opinion of the Court has added to the Act by judicial construction conditions not imposed by Congress and by which the Commission has been relieved of the obligation which requires that the findings be sustained by substantial evidence.

The order of the Commission is arbitrary and capricious, and should be reversed.