**WITHAM v. THE JAMES E. McALPINE**
**et al.**
**THE AWANDA L.**
No. 8383.

United States District Court
E. D. Michigan, S. D.

April 5, 1951.

724

John A. Gilray, Jr., Miller, Canfield, Paddock & Stone, Detroit, Mich., for the libelants.

Richards & Coffey, Buffalo, N. Y., Allan B. Lutz, Foster & Lutz, Detroit, Mich., for the respondents.

THORNTON, District Judge.

The respondents herein move for an order granting to them the following relief:

(1) Vacating and setting aside the purported attachment and seizure of the Steamer McAlpine and the Marshal's return thereon.

(2) Quashing and setting aside the purported service of process *in personam* herein on Brown Steamship Company.

(3) Discharging the Stipulation for Value filed herein by Brown Steamship Company and Aetna Casualty Company and releasing the parties thereto from any liability thereunder.

The respondents base their claims for relief under paragraph (1) upon the following grounds: "that the Steamer McAlpine was under way between Superior, Wisconsin, and Buffalo, New York, laden with a very valuable cargo when the U. S. Deputy Marshal of this District stepped aboard the ship without invitation or assistance from anyone on the said steamer, and in substance ordered her master to pull the loaded ship into the dock at Detroit and to tie up at the Pine Ridge Coal Company; that the Marshal has no power or authority to take over the direction and navigation of a vessel laden with valuable cargo which is merely passing through the District enroute to a destination outside the District and outside the jurisdiction of the Marshal; that he has no power or authority to order the navigators and the crew to take affirmative steps to navigate her to a certain designated destination or in a designated manner, nor has he power to incur on behalf of the United States or on behalf of the United States Marshal the potential tort and contract liabilities which are involved in risking collisions with other vessels and with docks, damage to ship under seizure by grounding, stranding, heavy weather, or contact with floating objects,

refusal of the crew to obey his orders, or negligent navigation in case it became necessary for him to take over the actual navigation of the vessel, * * * and that therefore there was in effect an abuse of process in connection with the purported seizure and attachment."

Further complaining, the respondents assert that an effective arrest of the vessel under way was a physical impossibility, and in support of this contention allege in part as follows:

"An analysis of the powers and duties of a United States Marshal with respect to an attachment or arrest of a vessel clearly demonstrates the soundness of the position taken by respondents in this Point. The powers and duties of the Marshal are contained in the provisions of Rule 10 of the Admiralty Rules as follows:

" 'Process in Suits in Rem—Public Notice.

"In all cases of seizure, and in other suits *and proceedings in rem,* the process if issued and unless otherwise provided for by statute, shall be by warrant of arrest of the ship, goods or other thing to be arrested; *and the marshal shall thereupon arrest and take the ship, goods or other thing into his possession for safe custody,* and shall cause public notice thereof, and of the time assigned for the return of such process and the hearing of the cause, to be given in such newspaper within the district as the district court, shall order; and if there is no newspaper published therein, then in such other public places in the district as the court shall direct. (Italics ours.)'

"The inability of the Marshal to comply with the directions contained in the Rule is at once apparent. It is inconceivable that he could take 'possession' of a vessel under way in a heavily navigated stream such as the St. Clair River. Consider the result if the master, officers and crew of the vessel upon being informed of the arrest, and in an attempt to comply, had departed their posts leaving the Marshal in sole control of the moving vessel. The result, in all probability, would have been a marine disaster, or a series of marine disasters, of serious proportions."

In the field of human affairs it is possible to imagine any number of dire happenings in almost any type of situation; the master of the vessel tells us what actually happened in this instance in the following affidavit:

"Ralph H. Russell, Master of the Steamer James E. McAlpine, being duly sworn, deposes and says:

"That on the 16th day of October, 1949 as the Steamer James E. McAlpine, laden with a cargo of corn and oats, en route from Superior, Wisconsin to Buffalo, New York, was proceeding, downbound, in the St. Clair River, and when said steamer was about abreast of St. Clair, Michigan, a United States Deputy Marshal named Sam O'Connell boarded the said vessel using a river ferry, and so boarded the vessel while she was underway. That the said ferry ran up alongside of the starboard side of the McAlpine and no request to board her was made but the Deputy Marshal stepped from the top of the cabin or canopy of the ferry to the spar deck of the McAlpine without assistance from any member of the crew of the McAlpine. That the said United States Deputy Marshal came to the pilot house of the McAlpine and handed deponent various papers, including a copy of the libel in the above entitled matter, together with a monition and attachment. That the said United States Deputy Marshal directed deponent to proceed to the Pine Ridge Coal Dock at Detroit, Michigan and there make fast and be detained pursuant to the terms of the District Court attachment. That the Marshal boarded the vessel as above described at about 12:45 P.M. E.S.T. on said date, and that at said time the said Steamer McAlpine had about four hours to run to the Pine Ridge Coal Dock. That at the time the Marshal boarded the vessel she was in American waters but that thereafter and between St. Clair, Michigan and Detroit, Michigan she crossed and recrossed the International Boundary Line in the St. Clair River between American and Canadian waters several times. Deponent questioned the Marshal as to his right to board the

vessel as she was underway, and the Marshal informed deponent that at the time he boarded and served the papers the Steamer McAlpine was within the limits of the jurisdiction of the District Court of the United States for the Eastern District of Michigan, or words to that effect. That thereafter and before the McAlpine reached Detroit, arrangements were made over the ship to shore telephone for release of the vessel, and the Marshal was directed by telephone to allow the vessel to proceed, and he departed, using Westcott's ferry at Detroit, Michigan, and no loss of time to the vessel was occasioned on account of the above described occurrence."

Section 226 of Title 46 U.S.C.A. reads as follows: "Licenses of captains. Whenever any person applies to be licensed as master of any steam vessel, or of a sail vessel of over seven hundred tons, the inspectors shall make diligent inquiry as to his character, and shall carefully examine the applicant as well as the proofs which he presents in support of his claim, and if they are satisfied that his capacity, experience, habits of life, and character are such as warrant the belief that he can safely be intrusted with the duties and responsibilities of the station for which he makes application, they shall grant him a license authorizing him to discharge such duties on any such vessel for the term of five years; but such license shall be suspended or revoked upon satisfactory proof of bad conduct, intemperate habits, incapacity, inattention to his duties, or the willful violation of any provision of this chapter or chapter 14 or 15 applicable to him."

Section 231 of Title 46 U.S.C.A. provides as follows: "Oath of licensed officers. Every master, chief mate, engineer, and pilot, who receives a license, shall, before entering upon his duties, make oath before one of the inspectors provided for, to be recorded with the certificate, that he will faithfully and honestly, according to his best skill and judgment, without concealment or reservation, perform all the duties required of him by law. * * *"

From the foregoing statutory requirements in relation to the master of a vessel such as The McAlpine, we have a right to presume that such a person would be law abiding and invested with prudence and good judgment and a person who, like Captain Russell, would recognize and respect lawfully constituted authority in the person of a Deputy United States Marshal in possession of a lawful writ of attachment which he is in the process of executing in a legal manner.

The "odd one" who might be interested in resisting, interfering with, or impeding the Deputy United States Marshal in the pursuit of his statutory duties by "departing his post and leaving the Marshal in sole control of the moving vessel" would, in the opinion of this Court, be guilty of conduct that would warrant the revocation of his master's license under the provisions of Sec. 226 of Title 46 U.SC.A.

In describing the general powers and duties of the United States Marshal, Sec. 547 of Title 28 U.S.C.A. embraces the following: "(b) He shall execute all lawful writs, process and orders issued under authority of the United States, and *command all necessary assistance to execute his duties.*" (Italics supplied.)

We have been asked to "consider the result if the master, officers and crew of the vessel upon being informed of the arrest, and in an attempt to comply, had departed their posts leaving the marshal in sole control of the moving vessel. The result, in all probability would have been a marine disaster, or a series of marine disasters of serious proportions."

Since the process in the instant matter was regular and legal on its face, the Deputy United States Marshal was justified in executing it and if, at the time of the execution of the same, Captain Russell and the other officers and crew of the McAlpine had "departed their posts and left the Deputy United States Marshal in sole control of the moving vessel" then, and in that event, the Deputy United States Marshal would have commanded the master, the officers and the crew to assist him in the execution of his duties as provided for in Sec. 547 of Title 28 U.S.C.A. Since this would be a lawful duty imposed upon the

master by the Deputy United States Marshal, the master would be expected to "faithfully and honestly, according to his best skill and judgment, without concealment or reservation, perform all the duties required of him by law", as the said master had previously taken an oath to perform all the duties required of him by law under the provisions of Sec. 231 of Title 46 U.S.C.A.

In the event that the master, the officers and/or the crew of The McAlpine refused to comply with the command of the Deputy United States Marshal that they render assistance to him in the execution of his duties then, in the opinion of this Court, they would be guilty of a willful breach of duty in refusing to do a lawful act, proper and requisite to be done by them, for preserving The McAlpine from immediate loss, destruction or serious damage; and the Deputy United States Marshal, in the exercise of proper judgment, would temporarily relinquish his efforts to execute the lawful process and would come ashore by whatever means would be available to him, and would immediately present the matter to the United States Attorney for the Eastern District of Michigan for consideration of a criminal prosecution of the master, officers and crew of The McAlpine under the provisions of Sec. 2196 of Title 18, U.S. C.A. On the next occasion when the Steamer McAlpine would be within the jurisdiction of this Court, the United States Marshal would call upon the United States Coast Guard for assistance in executing the process upon the said vessel in the event that any assistance would be necessary.

With the foregoing, we abandon the Tramp Steamer "Conjecture", and in examining Rule 10 of the Admiralty Rules, 28 U. S.C.A., we find the following directive: "and the marshal shall *thereupon* arrest and take the ship, goods, or other thing into his possession for safe custody". (Italics supplied.)

A definition of "thereupon" by Bouvier is "without delay or lapse of time."

Since the words of a statute are generally understood in their "usual and most ordinary signification, not so much regarding their grammar as their general

and popular use", Detroit Edison Co. v. Securities & Exchange Commission, 6 Cir., 119 F.2d 730, 738, and "Statutory provisions which are unambiguous must be read in their natural and ordinary sense", Mesaba-Cliffs Min. Co. v. Commissioner of Internal Revenue, 6 Cir., 174 F.2d 857, it is apparent that under the provisions of Rule 10, the Marshal is directed to execute the type of process covered by the rule when the ship comes within the jurisdictional limits of his District, without delay or lapse of time. If the Supreme Court had intended that the Marshal should not serve the process covered by this rule until the ship was tied to a dock, or anchored within the jurisdictional limits of the District, then the rule could easily have read, "and the marshal shall, when it comes to rest within his district, arrest and take the ship, goods or other thing into his possession for safe custody." Under well established principles of statutory construction, we have no right to read such a restriction into the rule. Admiralty Rules have the force of statutes. Criscuolo v. Atlas Imperial Diesel Engine Co., 9 Cir., 84 F.2d 273, 279.

In support of paragraph (2) of the respondents' motion to quash, they allege that: "the Brown Steamship Company does not carry on business in the State of Michigan, has no office in the State of Michigan, no agent in the State of Michigan, and no resident agent appointed for the service of process; and that the mere service of process on the master of one of several vessels operated by a company not doing business in the State of Michigan does not constitute good service *in personam* on the steamship company."

The Brown Steamship Company was incorporated in the state of New York on July 8, 1907, and Paragraph II of the Certificate of Incorporation reads as follows:

"The specific objectives for which it is to be formed are the following, viz.:

" 'For the purpose of building, contracting for the building of, equipping, furnishing, fitting, purchasing, chartering, navigating, operating or owning steam vessels and barges to be used in business, trade,

728

commerce and navigation and for the carrying, transportation or storing of lading, freight, property or passengers.' "

and in keeping with these purposes the said corporation owns and operates the Steamer James E. McAlpine and the Steamer J. J. H. Brown.

A summary of the operations of these two vessels during the years 1948 and 1949, as taken from their respective logs, divulges the following:

"During the year 1948 these two vessels made eighty-six trips through the Detroit River and were in Michigan ports sixteen times, loading cargo in Michigan ports nine times, unloading cargo in Detroit, Michigan, seven times and making five trips with cargo from one Michigan port to another; during the year 1949 these two vessels made seventy-nine trips through the Detroit River and were in Michigan ports seven times, loading cargo in Michigan ports six times, unloading cargo in Detroit, Michigan, once and making one trip with cargo from a Michigan port to Detroit, Michigan, where the cargo was unloaded."

"During the year 1948, Brown Steamship Company purchased for delivery to its ships within the State of Michigan, steward's supplies three times, groceries seven times, and fuel twenty-two times, paying for these items a total of $24,317.63. In 1949, steward's supplies were purchased twice and ship chandlery supplies once, groceries three times, and fuel twenty-two times, the total disbursements for these items amounting to $33,427.26. In addition, four crew members were hired in Michigan in 1948, two of them being hired in 1949 within this State."

From the foregoing it appears that the Brown Steamship Company was doing business in the state of Michigan during the years 1948 and 1949, and the service of process upon the master of one of the vessels owned and operated by the Brown Steamship Company on October 16, 1949, was a valid service upon the Brown Steamship Company at a time when it was doing business within the state of Michigan.

The motion is denied in all respects.